**WINDSOR REAL ESTATE &
MORTGAGE COMPANY,
Plaintiff-Appellant,**

v.

**Thomas RUMA, Defendant-Respondent.**

No. 47045.

Missouri Court of Appeals,
Eastern District,
Division Two.

July 17, 1984.

John W. Moticka, St. Louis, for plaintiff-appellant.

Patrick R. Gunn, St. Louis, for defendant-respondent.

PUDLOWSKI, Judge.

This appeal arises from an action by a landlord (Windsor) to recover rent and a counterclaim by the tenant (Ruma) for conversion. The trial court found against Windsor in its first amended petition and awarded Ruma $10,850 on his counterclaim.

We affirm in part and reverse in part.

Plaintiff-appellant, Windsor Real Estate & Mortgage Co. (Windsor), is the owner and manager of the Covington Manor Shopping Center in St. Louis County, Missouri. In 1976, defendant-respondent, Thomas Ruma (Ruma) and The Nooney Company (Nooney), then owner of the shopping center, entered into a three-year lease for the store unit at 1373 Quantock Drive. Between 1976 and 1979, Ruma made certain improvements to the premises. On January 19, 1979, Ruma and Nooney entered into a second three year lease. At this time, Ruma was using the premises as a pizza parlor and commissary.

On July 20, 1979, Windsor purchased the shopping center and took assignments of the leases then existing between Nooney and the tenants of the shopping center, including the lease between Ruma and Nooney. On October 7, 1980, a fire occurred in Ruma's store unit, rendering it "unfit for occupancy" within the terms of the lease. Windsor, thereafter, gave Ruma written notice that the store unit would be repaired to its 1976 condition. The store unit was repaired on January 1, 1981. However, Windsor did not replace the improvements which Ruma had purchased and used to convert the premises into a pizza parlor and commissary.

After January 1, 1981, Ruma refused to resume possession. Thereupon, Windsor began to look for a new tenant. On November 1, 1981, Windsor relet the premises, three months prior to the expiration of Ruma's lease.

In November, 1981, Windsor filed its first amended petition seeking 10 months unpaid rent, unpaid utilities, 9% interest on the payments after they became due and its costs and attorney's fees. Ruma's answer raised the right to terminate, failure to restore and acceptance of surrender defenses. Ruma also filed a counterclaim

wherein he alleged that Windsor had converted personal property left on the premises after the fire.

The trial court specifically found and concluded:

1. Windsor had an obligation, pursuant to the lease, to restore the premises to a pizza parlor and commissary after the fire, and its failure to do so caused the lease to terminate as of the date of the fire;

2. Windsor reentered the premises, resumed possession thereof in its own right and attempted to relet the premises for its own benefit and not as Ruma's agent; and,

3. Windsor converted personal property on the premises after the fire which belonged to Ruma and which had a value of $9,195.

The trial court's order awarded Windsor nothing on its first amended petition, and awarded Ruma $10,850, including $1,655 interest on his counterclaim.

Three points have been raised on appeal. (1) The trial court erred in ruling Windsor was obligated to restore the premises to a pizza parlor and commissary after the fire. (2) The trial court erred in finding Windsor reentered the premises and resumed possession. (3) The trial court erred in determining Windsor had converted Ruma's property.

In its first point, Windsor argues the obligation upon it with relation to a fire loss, such as was suffered by Ruma at his place of business, is to "repair destruction or damage" but not "restore the demise premises to their former condition." Windsor arrives at this determination from the interpretation of the lease which states in relevant part:

> If the demise premises shall be destroyed or damaged by fire or other casualty so as to be unfit, in whole or in part, for occupancy and such destruction or damage could, as determined by landlord in good faith, *reasonably be repaired* within six (6) months from the happening of such destruction or damage, ...
> *Landlord shall repair destruction or*

*damage* .... If, however, such destruction or damage to the deemed premises shall be determined by the Landlord in good faith to not reasonably be repairable within six (6) months from the happening thereof, [and] ... Landlord shall elect to repair or rebuild ... *Landlord shall restore the demised premises to their former condition* .... (Emphasis added)

Windsor's interpretation of the lease is a misplaced definitional distinction. Repair has been defined as "[t]o mend, remedy, *restore*, renovate, to *restore to a sound or good state after,* injury, dilapidation, or *partial destruction."* Blacks Law Dictionary, Fifth Edition 1979. (Emphasis added). Further, in determining the intent of the parties to a lease, the entire lease is to be examined. *Laiben v. Department of Revenue*, 572 S.W.2d 173 (Mo. banc 1978). From our examination of the lease, no recognizable distinction can be drawn from the phrases "landlord shall repair destruction or damage" and "landlord shall restore the demised premises to their former condition."

Alternatively, Windsor argues regardless of whether it was obligated to "repair" or "restore" the premises to their former condition, Windsor did not have a duty to rebuild Ruma's pizza parlor. In 1976 when Ruma originally rented the premises, he rented a shell. The improvements and conversion into a pizza parlor were selected by, paid for, installed by and owned by Ruma. Windsor argues, as such, any repairs to personal property, as a result of fire, is upon Ruma.

In this regard, Ruma admits he bears the risk of loss due to a fire. Ruma further concedes it is his obligation to keep items of personal property in good repair, to replace such items of personal property should they become defective or damaged, that Windsor is not responsible for damage thereto and it is his obligation to insure his personal property. However, Ruma argues, the loss of the property was not caused by fire but by Windsor's unauthor-

ized seizure. Ruma contends it is this unauthorized seizure of his personal property that accounted for Windsor's failure to restore the premises to their former condition.

■ Assuming Windsor did seize the property without Ruma's consent,[1] such seizure would give rise to an action in conversion, *Houston v. Columbia Federal Savings and Loan Association*, 569 S.W.2d 211 (Mo.App.1978), but would not justify termination of the lease. Ruma's proper remedy would be damages for loss of business profits due to the conversion. Ruma did not seek these damages. However, he did counterclaim for conversion of his property. A claim for conversion is tantamount to a "forced sale" of property. Ruma can not, after "forcing the sale" of his property, demand its restoration.

■ Additionally, Ruma has conceded the property in question was personal and did not belong to the building. By specific reference to the lease, "Landlord shall procure during the term of the lease, fire, windstorm, and extended coverage on the *buildings* composing the shopping center" and "[a]ll property belonging to Tenant or any occupant of the leased premises or of the shopping center shall be there at the risk of Tenant or such other persons only, and *Landlord shall not be liable for damage thereto*." (Emphasis added). The trial court erred in finding Windsor was obligated to restore the premises to a pizza parlor and commissary after the fire.

In conjunction with his first point, Windsor argues the trial court erred in determining it had re-entered and resumed possession of the premises thereby terminating Ruma's obligations under the lease. The trial court's finding was premised upon Windsor attempting to sublease the premises for $143 more than the rental paid by Ruma. In reaching his conclusion, the trial court relied on *Rhoden Investment Co. v. Sears, Roebuck and Co.*, 499 S.W.2d 375

(Mo.1973). *Rhoden* held when a tenant is in default, a landlord has three options:

First, a landlord may remain out of possession of the premises and treat the term as continuing and recover rent from the tenant;

Second, a landlord may give notice to the tenant of its efforts to re-rent the premises in order to mitigate its losses while retaining the right to collect losses from the tenant; or

Third, a landlord may re-enter the premises, resume possession in its own right and close the term of tenant's lease.

■ *Rhoden*, however, is subject to two exceptions. First, if a lease contains a clause granting to the landlord a right to reenter and release in the event of the tenant's default, such a provision constitutes a consent by the tenant to the reentry and reletting and prevents the landlord's action from constituting an acceptance of the surrender. *Gruber v. Adler*, 600 S.W.2d 669 (Mo.App.1980). Second, if a lease does not contain such a clause, a landlord's attempts to relet will not, as a matter of law, constitute an acceptance of the tenant's surrender until a tenant is found. *Id.*

■ The case at bar is subject to the first exception. The lease contained a consent to reenter and relet clause. As such, Windsor did not, by the sole act of attempting to relet the premises, resume possession. In opposition Ruma cites *Duffy v. Day*, 42 Mo.App. 638 (1890) for the proposition that an attempt by a landlord to lease the vacated premises for a higher rental price constitutes an acceptance of the tenant's surrender. In *Duffy*, the landlord, after vacation of the premises by the tenant, made repairs to the premises with the intention of improving the property so as to command a better rent. The court stated:

The defendant's evidence tended to show that the house was newly papered in December or January. This fact,

**1.** Windsor denies appropriation of Ruma's property and in his third point alleges trial court error in this determination.

standing by itself, without explanation, had some tendency to prove that the plaintiff intended to so improve the property as to command a better rental, and not merely to keep the house in proper repair for another tenant. *This fact is supplemented by the further testimony that the plaintiff did advance the rent.* We assume that the efforts made by the plaintiff to find another tenant for the property are justified by him on the ground that he was endeavoring to rent the property in order to relieve the defendant from liability; in other words, that, while he intended to make the defendant pay the loss while the house was vacant, his efforts to re-rent were entirely in the interest of the defendant. *This can hardly be reconciled with the fact that the plaintiff advanced the rent.* It is admitted that he took possession and that he and his son undertook to find another tenant; *therefore, if he intended to make the defendant pay until another tenant could be secured, good faith required that the property should be offered on the same terms.* As it is, it afforded some evidence that the plaintiff had assumed exclusive control of the property, and he no longer looked to the defendant for rent. (emphasis added).

*Duffy* at 642, 643.

While *Duffy* continues to prevail it is not dispositive of the issue in our case. Our attention must first be drawn to the lease entered into between the parties. Clause 36, relating to landlord's rights and tenant's liability in the event of tenant's default states in relevant part:

\* \* \* \* \* \*

Landlord may relet the said premises as agent for and in the name of Tenant at any rental readily obtainable, applying the proceeds and awaits thereof, first to the payment of such expenses as the Landlord may have been put to in re-entry, and then to the payment of such rentals as the same may from time to time become due and towards the fulfillment of the other covenants and agreements of the Tenant herein contained, and the balance, if any, shall be paid to the Tenant.

\* \* \* \* \* \*

Clause 36 of the lease specifically recognizes Windsor's right to relet the premises at any rental readily obtainable. Given this right, our determination whether Windsor was acting in its own behalf or that of Ruma must rest on whether the new rental price of $1,000 was a "rental readily obtainable."

Ruma's lease was executed in January 1979. The initial rental price was $858 per month.[2] The breach occurred in January 1981, two years after the execution of the lease. The rental increase to $1,000 represents an increase of approximately 16.5 percent.

From the evidence before this court, we are unable to determine whether $1,000 rental represents "any rental readily available." Sylvester Striler, Senior Property Manager with Windsor, testified $1,000 would have been their market rate. No other evidence was offered by either party nor did the trial court make any findings in regard to this issue. Therefore, we remand to the trial court to determine whether Windsor's attempted rental of the premises at $1,000 per month represented a rent readily available. Should the trial court determine the increased rental to be a rental readily available and as such not to be in breach of lease agreement, the trial court is ordered to enter a judgment finding Ruma liable as follows:

$8,787.32 (unpaid rent in the amount of $858 per month and unpaid utilities in the amount of $207.32 for the period from January 1, 1981 through October 31, 1981).

Six percent interest on each rental and utility payment after it became due (pur-

2. $833 was for rental of the premises and $25 was for a charge for the common area. For convenience, the total price $858. will be referred to as "rental."

suant to Section 408.020 RSMo 1978).[3] Windsor's costs, attorneys' fees and expenses incurred in the prosecution of this lawsuit (pursuant to paragraph 38 of the lease).

Additionally, Ruma is credited $426, the amount by which the rent for November, 1981 through January, 1982 exceeded the amount Ruma agreed to pay.

Finally, Windsor appeals the trial court's finding it had converted property belonging to Ruma with a value of $9,195 Windsor's argument is premised on the fact that the only people who had access to the premises after the fire were Ruma himself and the workmen hired by Windsor to restore the premises. Windsor argues there was no direct evidence indicating the workmen had taken the property.

We acknowledge Windsor's argument pertaining to Ruma's failure to produce direct evidence. However, there was sufficient circumstantial evidence to support the trial court's ruling. The evidence revealed only two parties had access to Ruma's property. Both parties denied taking the property. The trial court had the opportunity to judge the credibility of the witnesses. We will not reverse a trial court's ruling absent a finding that no substantial evidence exists to support the ruling or that the ruling is against the weight of the evidence. *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976).

On the issue of value, Windsor contends the evidence does not support a finding of $9,195. Specifically, the trial court awarded Ruma $5,650 for relocating the existing furnace and air conditioning system, furnishing and installing 30 inch wall fan with shutters and furnishing and installing three roof fans. The court also awarded $902.04 for shelving. It is these allocations Windsor is contesting.[4]

In regard to the $5,650 award, Ruma sought to recover the amount it would cost to relocate the furnace and air conditioning system. In 1976, when Ruma first leased the premises from Nooney, he relocated the furnace and air conditioning system to accommodate his restaurant. In January, 1981, Windsor returned the furnace and air conditioning system to their original locations.

Prior to Windsor's relocation of the equipment, Ruma had given notice of his intent to terminate the lease. With the termination went Ruma's right to locate the furnace and air conditioning system as he saw fit. In reliance on the notice of termination, Windsor was justified in removing the furnace and air conditioning system from a location peculiar to use in Ruma's restaurant and relocating it to its original position. Ruma is not entitled to recover the cost of relocating the furnace and air conditioning system.

However, in proof of this expense, Ruma submitted an appraisal which included equipment (wall fans and roof fans) which the trial court determined had been converted. There was no evidence of how the total charge was allocated among the various items. Therefore, we reverse and remand for a hearing consistent with the trial court's finding that the wall and roof fans had been converted to afford Ruma an opportunity to prove the value of these fans.

In regard to the $902.04 awarded for shelving, the invoice submitted by Ruma to prove value was dated October 10, 1980, three days after the fire. In addition, the invoice specifically referred to the shelving as "replacement of fire loss items." The only evidence relating this loss to the conversion and not as a result of the fire was Ruma's testimony that all of the estimates were obtained at the same time, March, 1981. The invoice date directly contradicts this testimony. Further, Sylvester Striler testified, on behalf of Ruma, that the workmen didn't physically start to work until November 1, 1980. There is no

---

3. § 408.020 RSMo Supp.1982, allowing nine percent interest, was not effective when this cause of action arose.

4. Windsor does not contest the remaining value of the property in question.

evidence to support the contention the shelving units were converted by Windsor. The overwhelming evidence indicates the units were destroyed in the fire. The trial court's award of $902.04 for replacement of the shelving units is reversed and vacated.

Judgment affirmed in part and reversed in part and remanded for a hearing consistent with this opinion to determine whether the increased rent sought by Windsor was "rental readily available" and to prove value of the wall and roof fans converted.

So ordered.

CRIST, P.J., and SIMON, J., concur.