Nancy C. COLLET, et al., Respondents,

v.

AMERICAN NATIONAL STORES, INC., et al., Appellants.

No. 49423.

Missouri Court of Appeals, Eastern District, Division Two.

March 11, 1986.

Motion for Rehearing and/or Transfer Denied April 8, 1986.

Application to Transfer Denied May 13, 1986.

Thompson & Mitchell, Charles A. Newman, James W. Erwin, Gallop, Johnson & Neuman, Edwin D. Akers, Jr., St. Louis, for appellants.

Grier & Swartzman, Paul D. Sinclair, Ramona K. Kantack, Kansas City, for respondents.

CRIST, Judge.

Nancy Collet and Centerre Bank of Kansas City, N.A., as the executor of the estate of William A. Collet, brought this action against American National Stores, Inc. (Stores) alleging the breach of a 25–year lease for a building in Terre Haute, Indiana. The Collets also sought recovery against defendants American Investment Company (AIC) and Public Acceptance Company (Acceptance), respectively the parent corporation and a sister corporation of Stores, on theories of piercing the corporate veil or breach of fiduciary duties.

Trial was held in two stages. At the first stage, in July of 1983, the issues related to Stores's breach of the lease were tried. The court filed findings of fact and conclusions of law which held Stores had breached the lease, and the Collets were entitled to damages. After the second stage of the trial, which was held in March of 1984, the court concluded AIC, the corporate parent of Stores, was liable for Stores's breach of the lease, but found Acceptance, Stores's sister corporation, not liable. The court entered an amended judgment on November 13, 1984, awarding the Collets compensatory damages of $270,125.96 against Stores and AIC, and punitive damages of $179,000 against AIC. Stores and AIC appeal.

## AMERICAN NATIONAL STORES

Plaintiffs are the assignees of a 25–year lease dated December 31, 1970 between Stores and the Ted H. Greene Agency Company. Stores was created to facilitate AIC's acquisition of several furniture stores. In March of 1966, AIC funded the purchase of the assets of Biederman Furniture Company and Van Furniture Company. Due to restrictions in AIC's long-term debt instruments which limited the money AIC could invest in non-finance businesses, AIC incorporated two wholly-owned subsidiaries to accomplish the acquisition. Biederman National Stores, and its successor corporation Stores, acquired the buildings, leases, equipment, and other contract

rights owned by the two original companies. B–N Acceptance Company and its successor Public Acceptance Company purchased the inventory and accounts receivable of those firms. The lease was assigned by the Greene Agency to plaintiffs on February 22, 1971, and the assignment was acknowledged by Stores on March 15, 1971.

Stores occupied the demised premises, and used them as a furniture store under the trade name "Langs" for approximately three and one-half years. On July 22, 1974, Stores advised plaintiffs they would vacate the premises on or about October 15, 1974. The notice stated that Stores would "exert every effort to find a new tenant" and suggested that plaintiffs also act to "secur[e] a new tenant at possibly an increase of rental income[.]" Plaintiffs replied they would cooperate, but they continued to look primarily to Stores to fulfill the lease, and disclaimed any and all intent to release Stores from its obligations. On August 28, 1974, Stores wrote the Collets referring to one possible buyer or tenant of the property, and stated if this prospect was not interested, "then we certainly would have no objection to your trying to find a buyer without releasing us from our obligation until … you are able to obtain a buyer who presumably use [sic] the building … and result in our being released from any further liability." This letter further suggested plaintiffs might want to purchase two adjoining parcels of land which could make the building more attractive to potential tenants or buyers.

Then, Stores, on September 6, 1974, advised plaintiffs they had exclusively listed the property for lease with Becker/Valentine & Associates Realtors (Becker), on the same terms as the existing lease. It was further stated Stores would be happy to relinquish their interest in the lease if plaintiffs found a buyer. Finally, in October, 1974, Stores closed the furniture business at the Terre Haute Building, turned the keys over to Becker, and abandoned the building. Stores ceased performance of its obligations under the lease, including the payment of rent and expenses (which included utilities, taxes and insurance) as pro-

vided in the lease. The amount due under the lease was $270,125.96 as computed by the trial court.

■■■ Stores first claims plaintiffs accepted Stores's attempted surrender of the lease when they did not give notice of their re-entry into the premises, and when they attempted to re-let the premises at a rent in excess of that provided for in the lease. However, the evidence clearly indicates Stores was in fact notified, prior to their vacation of the building, any re-entry by plaintiffs for the purpose of re-letting and/or selling the property was not to be considered a release of Stores's obligations under the lease. This was acknowledged by Stores on one occasion. Furthermore, the lease specifically provided (upon Stores's default) for the landlord to re-enter and re-let the premises without such re-entry being considered as a termination of the lease. Such a clause in the lease creates a presumption the re-entry was not the acceptance of a surrender or a termination of the lease, *Windsor Real Estate & Mortg. Co. v. Ruma*, 674 S.W.2d 252, 255[6, 8] (Mo.App.1984), even when the re-entry was without subsequent notice. See *Gruber v. Adler*, 600 S.W.2d 669, 671–72 (Mo.App.1980) (Tenant "understood" re-entry not to release him from obligation for rent and was notified he "would" be liable for rent). Also, acceptance of the proffered surrender by re-entry and attempt to re-let, even if without notice to the tenant, is only valid if the attempt to re-let is successful, which it was not in this case. *Windsor*, 674 S.W.2d at 255[7]; *Gruber*, 600 S.W.2d at 672.

■■■ Stores contends the attempt to re-let at a higher rental shows acceptance of the surrender. The record, however, indicates plaintiffs were willing to accept any reasonable offer, including an offer to lease the premises at the same rental as did Stores. Additionally, the lease gave plaintiffs the right to attempt to re-let "for such terms and *at such rental* and upon such other terms and conditions as Landlord may deem advisable," without the attempt

to re-let being considered the acceptance of a surrender. Stores recognized this right, as they were the first to suggest re-letting the premises at a higher rate. The point is denied.

■ Stores also proffers error in the admission of certain documents, claiming that they were not properly qualified as business records due to Mrs. Collet's lack of personal knowledge of the mode of preparation of the documents. Mrs. Collet testified while she was not personally involved in the creation of most of the records, she had been able, from her vantage point in sharing an office with her husband, to observe the creation of some of the records. She was able to describe the process by which they were created. However, even if she totally lacked personal knowledge of the mode of preparation, the records would be admissible. Personal knowledge of the sponsoring witness of the mode of preparation of documents sought to be admitted as business records is not required for admission of those documents. *Koenig v. Babka*, 682 S.W.2d 96, 100 (Mo.App.1984). The admission of business records rests on the trial court's discretionary determination of the trustworthiness of the records. This discretion was not abused here. *Id.* The judgment against Stores should be affirmed.

## AMERICAN INVESTMENT COMPANY

### Acquisition and Operation of Stores: 1966–1974.

In 1966, AIC acquired the assets of Biederman's Furniture Company and Van Furniture Company, and divided those assets between Biederman National Stores and B–N Acceptance Company as stated above. The initial acquisition cost of the two companies was $38,000,000. The initial paid-in capital of Stores was $5,000,000, contributed by AIC. The remainder of the purchase price was loaned from AIC. Six additional furniture companies were acquired by Stores and Acceptance during the next two years. No additional capital was contributed to Stores; the funds used to purchase the various furniture companies were loaned by AIC.

The purpose of Stores was to operate a chain of retail furniture stores, and own buildings, leases and equipment. These stores were operated under various tradenames acquired as the result of the acquisition of the furniture chains. AIC, not Stores, formed various subsidiary corporations in the various states to protect these tradenames. The purpose of Acceptance was to serve as Stores's inventory and receivable financier.

Nominally, Stores was a wholly owned subsidiary of AIC until December 31, 1973, when AIC sold the stock in Stores to a company owned by Wayne Klopp, Stores's last president. This sale effectively divides the corporate history into two parts. While AIC claims all pre–1974 matters are irrelevant, as a factual matter an understanding of the history of the corporation between 1966 and 1973 is necessary to an understanding of what transpired thereafter.

As a matter of formal corporate structure, Stores and Acceptance were wholly-owned subsidiaries of AIC, the parent corporation. AIC and Stores had a number of common officers and directors. AIC officers were always the majority on Stores's Board of Directors. The key officers of Stores, with the exception of the president, were all officers of AIC and all were on AIC's payroll. Other officers, responsible for some day-to-day operations, were on Stores's payroll. It appears those officers paid by Stores were subject to the control of the key officers, who were on AIC's payroll.

Donald L. Barnes, Jr. was the chairman of the board of both AIC and Stores. He was on the payroll of AIC, and received no compensation from Stores for his work on its behalf. He actively directed the operations of AIC, Acceptance and Stores.

Robert Brockman joined AIC in 1970 as an executive vice-president. Later, he was promoted to president. He also served as a vice-president and director of Stores. On AIC's payroll, he received no compensation from Stores. One of his primary roles was

to attempt to improve the operation of Stores, which, by the time he was initially hired, had begun to decline and was losing millions of dollars.

Harry Hartley was a vice-president, the treasurer and a director of both AIC and Stores. His role was to raise the necessary funds, through banks and other credit sources, to finance the operation of AIC and its subsidiaries, including Stores. Hartley was on AIC's payroll. Upon his resignation in 1973, his offices were assumed by Earl Tweedie.

Warren Van Norman was the secretary and a director of both AIC and Stores. He also served as AIC's general counsel, and was on its payroll.

These four officers also served in similar capacities with Acceptance.

Wendall Evans was the initial president of Stores. In 1970, he was replaced by Wayne Klopp, who was hired by the board of directors of AIC. He also served for a time as a director of AIC, and the record indicates he was the only officer common to the two companies to be paid by Stores. Klopp reported to and took direction from Barnes and Brockman.

Two other common officers were William A. Mahan, Comptroller of AIC and Comptroller and a vice-president of Stores, and D.H. Turner, a vice-president of AIC and assistant secretary and a vice-president of Stores. Turner was "loaned" to Stores to help them remedy a major credit problem in their southeast division stores. He was with Stores for over a year, and in fact moved his office from AIC headquarters to Stores's headquarters. He continued, however, to be paid by AIC.

Stores was always thinly capitalized. Upon the acquisition of the first two furniture stores, a contribution of capital of $5,000,000 was made by AIC. No further contributions of capital was made until AIC sold Stores in 1973, when an additional $14,100,000 was contributed. This contribution was offset by Stores's repayment of unsecured loans owed to AIC and its subsidiaries of $11,600,000. Analysis of Stores's capital structure showed it was far below that standard for the industry. Plaintiffs' experts described Stores as "grossly undercapitalized." The shaky capital structure was a major cause for concern and communication among the management of Stores and AIC.

From the beginning of Stores's operations, it had limited operating funds of its own. As a result, the company's operating funds were provided by AIC and these advances were carried as "loans" on the company books. All of the financial statements generated by AIC's outside accountants, Haskins and Sells, reflected the provision of operating funds by the parent. These "loans" grew rapidly in the early years of the corporation; from $26,259,000 at the end of 1966, to $70,354,000 by the end of 1967, $90,344,000 by the end of 1968, and $97,644,000 by the end of 1969. During the same period, Stores's sales went from $46,711,000 in 1966, to $79,256,000 in 1967, $96,730,000 in 1968, and $106,100,000 in 1969.

Funds were provided to Stores by AIC in various ways at various times. At the beginning, Acceptance provided Stores with its inventory. Stores's personnel would order furniture on forms provided by Acceptance, title would be taken by Acceptance, and Stores would sell the furniture on consignment. Later, Acceptance provided "floor plan" financing for Stores's inventory. Acceptance also financed Stores's receivables, first by buying them from Stores outright, then by loaning money to Stores secured by the receivables, and then, in 1970, they again began to purchase the receivables outright. Stores was never authorized by its board of directors to borrow against the receivables, although the board did in fact authorize the outright sale. Acceptance perfected its security interest in the inventory and receivables in 1969, a few years after the agreements were entered into, and at a time when Stores had already begun to sustain heavy losses.

The loans were made to Stores in a rather simple manner. AIC maintained an ac-

count at the First National Bank in St. Louis, against which all of its subsidiaries, including Stores, drew funds for their own use. AIC agreed with First National Bank that it (AIC) would cover all drafts issued by its subsidiaries. Conversely, Stores would deposit its receipts (i.e. from the sale of merchandise) in the AIC bank account in St. Louis.

There were no set limits on the amount of funds which could be drawn by Stores against its parent's account. There was no arm's-length extension of a loan; the funds were simply provided as needed. Periodically, an accounting would be made, and when there was an excess withdrawal by Stores from the bank account, it was carried as a loan from AIC to Stores. If there were any collateral to secure the loan, the loan was carried on Stores's books as a secured loan. If there were no available collateral, it was carried as an unsecured loan.

The nominal creditor was Acceptance, a subsidiary of AIC set up solely to service Stores. Acceptance had no employees, no payroll, or any other indicia of separate existence. It was only a series of accounting entries on the AIC books, some drafts, and purchase order forms. AIC executed a formal guaranty of Acceptance's debts, but did not do so with Stores.

During the period of 1966 to 1973, Stores's thin capitalization was a constant problem. The balance sheets reflected capitalization far below industry standards. As an example, for the year ending December 31, 1970, Stores had a negative working capital (current assets minus current liabilities) of $7,288,695. Liquidation of the assets would have reduced that amount even further, so that general, unsecured creditors of Stores would receive only a very small percentage of their claims in the event Stores were to be liquidated.

Initially, Stores made moderate profits, but by 1968, it began to lose money. During the remaining period of time AIC owned Stores, it sustained substantial losses. These losses were subsidized in several ways;

(a) AIC paid the salaries of several key officers.

(b) Stores's cash outlays were covered by AIC through the account in the First National Bank in St. Louis. When this was done, the advance was carried as a loan on the books.

(c) After 1970, these loans, which aggregated to millions of dollars, carried interest rates far below market rates.

(d) Stores's furniture sales were often made on credit and they employed several hundred people to generate loans and collect the payments. By the early 1970's, Stores sold these installment contracts to Acceptance, which in turn paid Stores approximately $7,000,000 per year to service these loans.

Haskins and Sells, AIC's outside accountants, commented on these practices in a financial statement:

Due to these arrangements, financial position, results of operations, and changes in financial position are not necessarily what they would have been if the company had operated as a separate, independent entity.

AIC, through its officers and directors, actively managed Stores. While Stores personnel operated the company on a day-to-day basis, this was subject to pervasive control by AIC. For example, a detailed annual operating budget was prepared by Stores. Not only was it necessary for this budget to be approved by Stores's officers, it was submitted to Brockman and AIC. Also, in 1972, despite annual sales of $70,000,000, AIC required all appropriation requests (defined by Brockman as capital expense requests) of Stores over $25,000 to be approved by AIC. By mid–1973, Brockman reduced the request approval level to $2,500. Thus, AIC controlled virtually all expenditures, both for operating and non-operating expenses.

Other ways in which AIC directly managed the planning and operation of stores are reflected in certain exhibits. Barnes, the AIC chairman, each month commented on Stores's performance in

memos he sent to the other directors with monthly financial statements. Actions taken by Turner to turn around the credit performance of the Southeast Division were reported to Brockman. One such memo, in which Turner reported to Brockman outlined problems with individual personnel, and specific procedural problems, and specific actions taken to alleviate those problems. This memo reflected the reference of a legal question arising wholly within Stores to AIC's legal department for an opinion. It also asks for a decision from Brockman and Klopp concerning some legal risks contemplated to inhere in the proposed sale of installment contracts (apparently from Acceptance which had purchased them from Stores) to outside finance companies. As a further example, another memo from Brockman to Klopp ordered a change in the basis of inventory in one division of Stores.

AIC did not, in reality, observe the formal legal separateness of a subsidiary with respect to Stores. The legal documentation appropriate for the operation of a separate entity was not evident. While there were numerous minutes of the meetings of the Board of Directors of Stores, and many resolutions of that board, critical papers apparently did not exist. For example, Stores borrowed tens of millions of dollars from AIC, secured by Stores's installment receivables. While various minutes and resolutions authorized Stores to *sell* receivables, there was no authorization for Stores to *borrow* the money, *pledging* the receivables as security. Also, there was no authorization for the borrowing of millions from AIC through the account with the First National Bank in St. Louis.

AIC officers themselves referred to Stores as a division. In some of AIC's annual reports for years prior to the sale, the materials prepared by AIC described Stores as a division (the financial portion of the reports for those years, prepared by Haskins and Sells, referred to Stores as a subsidiary). In the monthly memos Barnes sent to the AIC directors with the financial statements, he often called Stores a division. The minutes of two meetings of AIC's Board of Directors also referred to Stores as a division.

AIC made numerous decisions for Stores. Testimony indicated AIC actually made the decisions to close certain stores, rather than merely overseeing the decisions as they were made by Stores. For example, a decision, in February 1973, by the Board of Directors of AIC, was to close various stores, including the one leased from the Collets. The Collets were not notified of this decision until July of 1974. There is no record of Stores's Board of Directors ever authorizing this closing. Also, in 1971, Stores's installment receivables, of a value of $51,933,676, were sold to Acceptance, which then sold the bulk of those receivables to outside financiers. Revenue from those receivables had been $10,669,-288 in 1970. As a result of the sale, in 1971, Stores only held $4,330,725 in receivables and collected only $2,159,653 in income from them, a reduction in revenue of $8,500,000. This decision seems to have been made by Hartley, Barnes, Brockman, Van Norman, and AIC's outside accountants. No officers on Stores's payroll seem to have been consulted.

This decision seems to have been made to benefit AIC and not Stores. Other decisions appearing in the same vein include the sale of the company itself, and a decision, coming right before the sale was consummated, to have Stores purchase a three-year insurance policy from another AIC subsidiary at a substantial premium.

By 1973, the condition of Stores had deteriorated. AIC determined that Stores must be sold by December 31, 1973 for three major reasons;

(a) The substantial losses already sustained could no longer be ignored.

(b) Credit rating services were threatening to downgrade or remove the rating on AIC's own notes and commercial paper. AIC had borrowed substantial monies itself. If its ratings were downgraded or removed, the rates paid by AIC for its own borrowings would increase, which would damage AIC's own profits.

(c) If AIC could dispose of Stores through an "arm's-length" sale of the stock by December 31, 1973, it could deduct any loss as an ordinary loss from the sale of a worthless security, and receive a tax refund in excess of $9,000,000.

AIC first attempted to find an outside buyer for Stores. W.T. Grimm & Co. was retained to sell the company. These efforts were unsuccessful despite contacting scores of prospects. On November 30, 1973, Barnes reported to the AIC Board of Directors that negotiations were going on with three prospects, and if these negotiations should fail, they were studying a fourth, "stop-gap" alternative.

It is not clear exactly when a sale of Stores to Klopp was first contemplated. However, real negotiations began in earnest on December 21, 1973. Talks with outside prospects continued until December 30, 1973, when the last prospect, Neale Skorberg, declined the same terms later accepted by Klopp. Skorberg advised Barnes Stores would drain $4,000,000 in cash before the operation could be turned around. AIC, therefore, turned to its last hope, and sold the stock in Stores to American Furniture Company, a corporation purchased from AIC by Klopp.

Under the terms of the sale agreement, Klopp paid one dollar for all of the stock of Stores. AIC made a contribution to Stores's capital of $14,159,395, but Stores simultaneously paid outstanding unsecured loans owed to AIC of $11,628,000. This capital infusion increased the book value of Stores to $6,787,819; however, this appears illusory in the face of Stores's $6,000,000 loss in 1973 alone. The agreement also provided that Stores's balance sheet should reflect cash of $2,500,000. However, a related security agreement obligated Stores to pay Acceptance any cash it held in excess of $750,000.

This security agreement secured an inventory loan extended by Acceptance to Stores. Acceptance agreed to provide Stores a five-year loan, with the principle amount to be reduced periodically. The amount of the loan was to be as much as $19,000,000 in 1974, decreasing to $17,500,000 in 1975. No interest was due on the loan unless Stores earned over $500,000 before interest and taxes in either year. The loan was secured by Stores's inventory, and Acceptance was obligated to lend Stores 100% of the value of the collateral. This loan-to-value ratio would have been extraordinary in an arm's-length transaction.

The Security Agreement imposed controls on Stores characterized by Barnes as additional to those usually found in floor-plan security agreements. Without the agreement of the secured party, Stores could not:

(a) Raise the salary of any employee currently making more than $25,000 per year;

(b) Hire an employee to be paid more than $25,000 per year;

(c) Declare any dividends;

(d) Conduct any business other than furniture or related furnishing sales;

(e) Open new stores;

(f) Enter into any contractual or other commitments involving expenditure of more than $25,000 per year; or

(g) Make a capital expenditure greater than $25,000.

Also, if anyone made an offer to buy the assets of any of Stores's locations that equalled or exceeded the book value of the assets at that location, under the security agreement Stores was required to accept the offer, or the principle amount of the inventory loan would be reduced by an amount equal to the amount offered and not accepted.

In the two years prior to the sale, Stores had lost over $12,000,000. The prospect of further losses, to the amount of $4,000,000 in cash, caused the last outsider to refuse to purchase Stores. Despite the need for this $4,000,000, and despite the sales agreement which provided for Stores to retain cash of $2,500,000, the security agreement only allowed Stores to retain $750,000 cash. This was the only cash Stores would have

to reorganize the company and pay its operating losses.

While Stores had a book value in excess of $6,000,000, this figure was largely illusory and Stores was grossly undercapitalized. If locations were to be closed, Stores would suffer further losses on inventory due to the fact that inventory would have been disposed of by liquidation. If the entire company was liquidated, a likely prospect considering the company's prior history, then general creditors had little or no chance to recover a substantial portion of their debts because a large portion of the value of the assets shown on the balance sheets would be lost.

In the final analysis, however, the illusory nature of the book value is finally and conclusively demonstrated by the nominal purchase price. In the words of AIC, requesting a letter ruling from the Internal Revenue Service concerning the possible tax consequences, "[d]isposing of ownership of stock for the minimal consideration of one dollar should be considered as conclusive evidence of its lack of value."

When Klopp purchased Stores, he is alleged to have had some plan of action to turn Stores around. It is not clear what this plan as a whole entailed, or what, if any, features of this plan could not have been implemented under AIC ownership. Part of the plan included selling small amounts of Stores's stock to various officers and managers to give them a stake in the business. The money paid for the stock was repaid to the managers and officers just before Stores liquidated the lion's share of its business by late 1974. Before the implementation of Klopp's plan could even begin, Stores had to lay off several hundred credit operations workers due to the fact Acceptance was no longer purchasing Stores's installment receivables and contracting the servicing of these contracts to Stores. The income loss to Stores of over $7,000,000 per year further damaged Stores's chances of survival.

After Stores operated for a few months in 1974, it was suggested (apparently by Barnes) that Klopp discuss with one Jerome Schottenstein the possibility of having Stores work with Schottenstein's retail operation. Clarence Lumpkin, who at the time was a vice-president and the treasurer of Stores and who was the second-in-command of the company, testified he and Klopp were summoned to a meeting with Barnes, Brockman, Hartley, Schottenstein and a few others in the AIC boardroom. There, without prior consultation, they were informed that through a joint venture with Schottenstein, some 33 to 35 percent of Stores's operations were to be liquidated. (Klopp, however, testified he was in favor of the action.) Stores was not in default at this time under the security agreement. The matter had not been discussed with Lumpkin nor any of Stores's directors. Nevertheless, a large portion of Stores was liquidated through the Schottenstein joint venture.

At the beginning of July, Stores filed the monthly inventory report required under the security agreement. Stores was not in default at this point. Later that month, Lumpkin proposed that Stores form five corporations and transfer its assets into those corporations. Stores's debt to Acceptance was to be guaranteed by those corporations, and a proposed form of guaranty was drawn up and signed by Lumpkin on behalf of those corporations. No actual transfer of the assets ever occurred; Lumpkin denied the occurrence of the transfer, and Van Norman admitted he had not seen any document transferring assets from Stores to any one of these corporations. This proposed transfer was rejected by the AIC board on August 1, 1974.

On that same date, Barnes wrote Klopp, informing him of this decision, declaring Stores in default, and giving Stores 15 days from the date the assets were transferred to cure the "default." Barnes was not authorized by the AIC Board of Directors to declare a default. No default had actually occurred: The transfer plan had merely been submitted to AIC for approval as required by the security agreement, and had not been consummated.

This letter also informed Klopp the "default" would be discussed in a meeting the week of August 12. During this meeting, Klopp was told he could cure the "default" by closing five or six stores, which would reduce inventory by one-half million dollars. Despite this, AIC, in its semi-annual report for the period ending June 30, 1974, dated August 27, 1974, stated Stores had defaulted on the inventory loan. This surprised Klopp and Lumpkin, who believed they had agreed to cure the default by closing a few stores. When trade creditors learned of this "default," trade credit was cut off. Without trade credit, Stores could not continue to operate.

AIC also alleges Stores committed two other acts of default, by (1) failing to provide an inventory report on time, and (2) failing to make a payment on the loan. However, Stores was using AIC's computers at this time, and therefore the inventory information, which apparently was stored in those computers, was readily available to AIC. The payment could have been made; Stores's bank balance indicated the money was present, and AIC had permitted Stores to cure previous defaults of this nature by merely writing a check to cover the payment. Moreover, both "defaults" occurred following Barnes' declaration of the earlier "default," and, the second default came after the end of Stores's trade credit, which doomed Stores, so making the payment would have been a pointless act.

In September, they began to liquidate the company. Barnes and Brockman brought in Aaron and Norman Levitt to liquidate some of the stores. Other liquidators handled other locations, and the bulk of the rest of the operation was covered by the "Anlet Inventory Liquidation Agreement." Through the various liquidation sales, Acceptance recovered $12,408,620.83, losing about $4,500,000.

Only one location, Lauer's in New York, was left. On the day prior to the execution of the Anlet Liquidation Agreement, a new security agreement covering that location was signed. Klopp bought Lauer's inventory at $.74 on the dollar, and Acceptance, under the new security agreement, made a inventory loan of $.90 on the dollar. The effect of this arrangement reduced the inventory loan 10 cents on the dollar, and, at no cost to Klopp, pumped an additional $227,000 into the Lauer's operation. The agreement also provided for the inventory loan to be $1,400,000, reduced to $1,300,000 over five years. The loan was interest free over that period, unless Lauer's pre-tax profits exceeded $50,000 per year. Other restrictions in the security agreement were similar to those in the earlier Stores security agreement, with the exception Klopp was allowed to draw a salary of $75,000 per year.

In October of 1974, Stores's trade creditors filed an involuntary petition in bankruptcy against Stores. Dismissal of the action followed Acceptance's agreement to subordinate its unsecured claims until other creditors received a small portion of their claims. Stores, today, receives minimal income from subleases, but is otherwise defunct, and is not an operating company.

### Piercing the Corporate Veil.

AIC alleges the trial court erred in piercing the corporate veil. It argues first, that, due to the sale of Stores to Klopp in 1973, it did not exercise improper control of Stores at the time of the breach of the lease in October 1974. Second, AIC asserts its actions did not proximately cause plaintiffs' losses. And, third, AIC claims that as the trial court held Acceptance, the operating entity through which AIC acted, not liable, and as AIC's liability derives from Acceptance's liability, AIC also was not liable. In reviewing these contentions of error in this court-tried case, we note the evidence is to be viewed in the light most favorable to the judgment. *St. Louis County v. Oakville Development Co.*, 676 S.W.2d 919, 921 (Mo.App.1984).

Ordinarily, the separate legal identities of two corporations will be protected. This is true even where one corporation owns a part or all of the other. However, instanc-

es do occur when one corporation shows such domination and control over another that the latter corporation becomes a mere adjunct or the "alter ego" of the first. In such a situation, when the formal corporate separateness and the arrangements between the two corporations is devised or used to accomplish a fraud, injustice, or some unlawful purpose, then the separate formal corporate structures will be ignored. *Camelot Carpets v. Metro Distributing Co.*, 607 S.W.2d 746, 749 (Mo.App. 1980).

A tripartite test has been developed for analysis of the question. To "pierce the corporate veil," one must show;

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*National Bond Finance Co. v. General Motors Corp.*, 238 F.Supp. 248, 255 (W.D. Mo.1964). Analysis of the evidence presented demonstrates this test has been satisfied in this case.

When considering whether one corporation exercised control over another to the extent necessary, the courts have relied upon consideration of several factors which indicate the degree of control held by the dominant corporation over the subordinate corporation. These factors are:

(1) The parent corporation owns all of most of the capital stock of the subsidiary.

(2) The parent and subsidiary corporations have common directors or officers.

(3) The parent corporation finances the subsidiary.

(4) The parent corporation subscribes to all of the capital stock of the subsidiary or otherwise causes its incorporation.

(5) The subsidiary has grossly inadequate capital.

(6) The parent corporation pays the salaries and other expenses or losses of the subsidiary.

(7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.

(8) In the papers of the parent corporation or in the statements of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own.

(9) The parent corporation uses the property of the subsidiary as its own.

(10) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest.

(11) The formal legal requirements of the subsidiary are not observed.

*Northern Illinois Gas Co. v. Total Energy Leasing Corp.*, 502 F.Supp. 412, 416–17 (N.D.Ill., 1980).

It is apparent that, prior to the sale, all of these factors were met. AIC caused Stores's incorporation, subscribed to and owned all the capital stock of Stores, financed Stores, and paid some salaries and met certain expenses of the corporation. Officers and directors were common to both companies. Capitalization of the company was described as "grossly inadequate." Stores's assets were acquired with AIC funds. Stores were often referred to as a division of AIC by AIC and its officers and directors, and many of the formal legal requirements documenting action by Stores as a separate entity did not exist.

Also, AIC used the property of Stores as its own. One example is the sale of the installment receivables in 1970 from Stores,

to Acceptance, and then from Acceptance to outside firms, without any direct consultation with Stores. Finally, it is apparent Stores was operated for the best interests of AIC, and not for its own best interests. Stores acquiesced, without protest, in any demand made upon it by AIC, whether or not it was in Stores's best interests. This pattern continued to occur until the last moment, when Stores purchased a three-year insurance policy at a substantial premium from another AIC affiliate.

 Following the ostensible sale, while the formal relationship of the corporations changed from parent-subsidiary to creditor-debtor, the actual control held by AIC over Stores did not change. The ties of ownership between two companies were severed. However, just as the presence of complete ownership does not in and of itself merit the piercing of the corporate veil, (see *National Bond Finance Co.*, 238 F.Supp. at 255) likewise, the lack of ownership is not in and of itself sufficient to prevent the piercing of the corporate veil. See *Camelot Carpets*, 607 S.W.2d at 749. Also, there were no longer any officers and/or directors common to the two companies (however, D.H. Turner, an AIC officer "loaned" to Stores, continued to maintain his office at Stores for some time following the sale.) AIC stopped subsidizing Stores (except to the extent of granting an inventory loan of 100% of the value of the collateral, at effectively no interest). AIC also stopped referring to Stores as a division, and it does appear that the formal legal requirements for the operation of a corporation were met by Stores.

The other factors, however, continued to be met. AIC had caused Stores to be incorporated, and the sale did not alter this fact. AIC continued to finance Stores, which had no assets not derived from AIC funds. Stores was left with totally inadequate capital. With a balance sheet capital in excess of $6,000,000, Stores was to sustain a reduction in revenues of approximately $7,000,000. This was revenue which Stores had earned the year before, when it lost $6,000,000. Despite a forecast Stores

would lose $4,000,000 in cash before the operation could be rescued, AIC left Stores with only $750,000 in cash. And, it is apparent AIC continued to treat the assets of Stores as its own property, by ordering several liquidations of inventory. Stores's officers then followed these orders, which appeared to have been given in AIC's interest and not in Stores.

The best demonstration of AIC's overwhelming control lies in the actual course of events. First, AIC incorporated Stores, capitalized it with $5,000,000, then had it purchase eight furniture store companies. While the acquisition cost of two of those companies alone exceeded $38,000,000, no new capital was ever invested in Stores. According to the industry's standards, Stores was grossly undercapitalized. It was dependent upon AIC for operating funds. Stores, if an independent entity, would have been insolvent from the very beginning of its operation in 1966.

AIC termed the advances of cash it made Stores as loans, many secured by Stores's installment receivables and inventory. This insured that AIC, in case of the liquidation of Stores, would receive at least a part of its debt back while leaving the general creditors unprotected due to the reduced value of the other assets in a liquidation situation. These security interests were not perfected until after Stores began to lose money and liquidation became a possibility.

AIC operated Stores as its retail furniture division until 1973. They made decisions on such matters as the opening and closing of individual stores, the basis on which the inventory in one division of Stores would be carried for tax purposes and the terms and conditions upon which credit would be extended to individual retail furniture buyers. However, despite management by AIC, Stores posted such large losses that the management of AIC determined to sell Stores, and to do so before December 31, 1973 so as to collect a very large tax refund.

To sell Stores, AIC contacted scores of prospects and entered into serious negotia-

tions with three of these prospects. However, all of these efforts were to no avail. Barnes had reported if they failed to sell the Stores system to an outsider, he had a "stop-gap" plan. The Collets suggest this permits the inference there was an interim plan (sale to Klopp) followed by a final resolution of the problem (liquidation of the inventory, the recovery of the secured debts ostensibly owed to AIC, and the resulting freeze-out of the general creditors). Implementation of this "stop-gap" plan was initiated on December 30, 1973, at 6:00 p.m., when Barnes called to inform Klopp that Stores would be sold to him the next day.

This sale was not an arm's-length transaction. Stores would continue to be grossly undercapitalized, being given $6,000,000 capital with which to absorb not only losses which the previous year had exceeded that amount, but a certain revenue loss of an additional $7,000,000 as well. While Stores needed $4,000,000 in cash, it was only allowed to keep $750,000.

As AIC itself stated, the fact that Stores was purchased for one dollar indicated its lack of value.

AIC retained its control over Stores following the "sale" using, among other instruments, the security agreement. AIC argues, as the powers given AIC by the security agreement were never exercised, they cannot be relied upon to establish AIC's actual control over Stores following the sale. See Berger v. Columbia Broadcasting System, Inc., 453 F.2d 991, 998 (5th Cir.1972). They do, however, show that the sale was not an arm's-length transaction. These powers were so pervasive that a buyer under those terms would have subjected Stores to the almost total control of AIC. No buyer with a real plan to turn Stores around would consent to allow that company to be dismantled piece by piece, as provided by the security agreement. Therefore we cannot hold this sale to have been an arm's-length transaction.

Stores was operated, after the purported sale, as it was operated prior to the sale, while it was formally owned by AIC. Af-

ter waiting four months, apparently to avoid any possible complications under the bankruptcy laws, Stores was forced into the Schottenstein liquidation, even though Stores was not in default at that time, and AIC could point to no legal right to force a liquidation of ⅓ of the company. Then, a "default" was contrived, and forced the liquidation of virtually all of the remainder of the company.

AIC makes much of the fact that their control was largely financial. See *Krivo Industrial Supply Co. v. National Distillers & Chem. Corp.*, 483 F.2d 1098, 1110–12 (5th Cir.1973). However, AIC's control was not limited to exercise through the purse strings. They ordered the opening and closing of individual stores, and sold Stores's receivables. All corporate spending was controlled by AIC, which also dictated retail credit policies. While Klopp may have made some of the day-to-day decisions, the record clearly demonstrates the overall management of Stores was improperly controlled and dominated by AIC.

■ The mere finding of control by a dominant corporation is insufficient, however, standing alone, to pierce the corporate veil and impose liability upon the dominant corporation. The control exercised by that corporation must have been used in an improper manner. *Camelot Carpets, supra.* "If the corporate affiliation is devised or being used to perpetrate fraud or injustice or accomplish some unlawful purpose, equity will interpose to tear down technical legal barriers and pierce through the corporate veil...." *Lawton-Byrne-Bruner Ins. Agency Co. v. Stiers Bros. Const. Co.*, 186 S.W.2d 480, 484 (Mo.App. 1945). Examples of such wrongs as would satisfy this standard include actual torts, violations of statutory duties, undercapitalization, or the stripping of assets from the subservient corporation. *Matter of Palmer Trading Post*, 695 F.2d 1012, 1016 (7th Cir.1982).

■ In the instant case, there is ample evidence of both undercapitalization and the stripping of assets by AIC. The gross

undercapitalization of Stores is beyond cavil. Plaintiff's experts, whose testimony was accepted by the trial court, clearly testified Stores's capitalization was far below industry standards. This undercapitalization provided general creditors with recourse to an amount of assets far less than the amount necessary or usual in that industry.

Making a corporation a supplemental part of a economic unit and operating it without sufficient funds to meet obligations to those who must deal with it would be circumstantial evidence tending to show either an improper purpose or reckless disregard of the rights of others.

*May Department Stores v. Union Electric Light and Power Co.*, 341 Mo. 299, 107 S.W.2d 41, 55 (1937); See also *Consolidated Sun Ray, Inc. v. Oppenstein*, 335 F.2d 801, 808 (8th Cir.1964).

The evidence also indicated AIC stripped Stores of its assets. Over $12,000,000 was taken by AIC under the security agreements to satisfy the inventory loan following the Schottenstein liquidation and the liquidations occurring after the improper declaration of a default. These actions left Stores an empty hulk, devoid of substance to satisfy the legitimate demands of its other creditors. This was the culmination of a course of conduct which made it impossible for Stores to operate and satisfy its obligations, and justifies piercing the corporate veil. *See Camelot Carpets*, 607 S.W.2d at 750.

■ AIC also claims the Collets did not establish these actions were the proximate cause of their injury, thereby failing to satisfy the third portion of the test. However, it is clear when the action of the dominant corporate renders the subservient corporation insolvent, then the requisite injury and causal connection is established. E.g. *Northern Illinois Gas Company*, 502 F.2d at 420. Here, it is apparent AIC created Stores in an insolvent condition, maintained it in that condition, and finally destroyed it in that condition. Injury was

established, and therefore, appellants' points I and II are denied.

■ AIC next asserts the court erred in holding it liable to plaintiffs while it absolved Acceptance of that liability, arguing because Acceptance had the only formal relationship with Stores at the time of the breach, and because AIC's liability was derivative from that of Acceptance, if Acceptance was not liable then neither was AIC. The corporate veil is pierced when the acts of one corporation become the acts of another corporation due to the latter corporation's improper domination and control of the former. See *Consolidated Sun Ray, supra*. Acceptance, which consisted of only drafts, order forms and some accounting entries on AIC's books, was only a shell through which AIC acted. It was a sister, not the parent, of Stores. Acceptance never owned Stores's stock, never undercapitalized Stores, and never controlled or dominated Stores. Rather, AIC committed these actions; some through Acceptance, and some directly. Therefore AIC, rather than Acceptance, is liable. Appellants' point III is denied.

## PUNITIVE DAMAGES

In its last point on appeal, AIC challenges the trial court's award of punitive damages of $179,000 for breach of fiduciary duties, claiming they owed no such duties to the plaintiffs, and there was no foundation of compensatory damages which are necessary for the awarding of punitive damages. It is also asserted there was no proof of the malice necessary to support an award of punitive damages. In this latter contention, AIC is correct.

■ For the award of punitive damages to stand, it must be established that AIC acted, at the least, with legal malice. *Oster v. Kribs Ford, Inc.*, 660 S.W.2d 348, 355 (Mo.App.1983). Legal malice is shown by the intentional, knowing commission of a wrongful act without just cause or excuse, and in contravention of, or reckless disregard for, the rights of others. *Id.* at [6]; *Yost v. Household Finance Corporation*, 422 S.W.2d 382, 385 (Mo.App.1967).

Actions taken in good faith, without any bad motive or wantonness, do not justify the imposition of punitive damages. *Ozark Wood Industries v. First National Bank,* 625 S.W.2d 651, 654[11] (Mo.App.1981).

■ The record fails to show AIC's actions were of such a character as to justify the imposition of punitive damages. While the evidence shows AIC and its officers acted improperly in its relationship with Stores, it did not reflect that their actions, when taken, were intentionally or knowingly wrongful. While AIC may have failed to appreciate the illegality of their conduct as a whole, there was no showing their actions were not taken in good faith, and in ignorance of the wrongfulness of those action when taken. *Compare Ozark Wood Industries,* 625 S.W.2d at 654–55, *with Oster,* 660 S.W.2d at 355–57. Therefore, even if we assume AIC owed the Collets some fiduciary duty, which was breached, and for which breach, the Collets were awarded compensatory damages (matters upon which this court expresses no opinion), the award of punitive damages is improper and cannot stand.

The judgment against American National Stores is affirmed. The judgment against American Investment Company for compensatory damages is affirmed, and the judgment against American Investment Company for punitive damages is reversed.

DOWD, P.J., and CRANDALL, J., concur.