**MRI NORTHWEST RENTALS INVESTMENTS I, INC.,
Plaintiff–Respondent,**

v.

**SCHNUCKS–TWENTY–FIVE, INC., and Allied Supermarkets, Inc.,
Defendants–Appellants.**

**No. 58676.**

Missouri Court of Appeals,
Eastern District,
Division Two.

April 16, 1991.

532

William J. Travis, St. Louis, for defendants-appellants.

Michael Aubrey Clithero, Robert O. Hetlage, St. Louis, for plaintiff-respondent.

GARY M. GAERTNER, Presiding Judge.

Appellants, lessees, Schnucks–Twenty–Five, Inc., and Allied Supermarkets, Inc., appeal from a judgment of the St. Louis Circuit Court in a bench-tried landlord/tenant dispute which awarded respondent, MRI Northwest Rental Investments I, Inc. (MRI), as lessor, two hundred nineteen thousand, two hundred ninety-seven dollars and forty-six cents ($219,297.46). Appellants' sole point on appeal concerns the respondent's duty to mitigate damages after appellants breached a commercial lease. We affirm.

Respondent is the sole general partner of Northwest Plaza Associates, Ltd., the owners of Northwest Plaza Shopping Center. In 1965, appellant, Allied Supermarkets, leased a building at Northwest Plaza from respondent's predecessor in interest. In 1970, Allied assigned the lease to appellant, Schnucks, who opened a Schnucks grocery store on the premises. The lease was amended in 1978 to require that appellants continuously operate their business on the leased premises throughout the entirety of the leased term. Another 1978 amendment permitted appellants to terminate the lease providing they gave the lessor one year notice of their intent to terminate and of their intent to cease operation of their business.[1]

In 1983, respondent became the owner of Northwest Plaza and the landlord under the lease. The lease was renewed commencing March 1, 1985, and was to remain in effect until February 28, 1990. However, on March 12, 1985, appellant Schnucks wrote respondent and stated that they intended to exercise their option to terminate the lease and cease operation of their business on March 15, 1986. Instead, appellant Schnucks ceased operations on March 24, 1985, and vacated the premises. Respondent informed appellants that they considered appellant Schnucks' attempted notification invalid since appellant

Schnucks closed a mere eleven days after giving their notice to terminate, rather than the one year required by the lease.

Appellant Schnucks paid the full rent due under the lease through March 15, 1986, in accordance with their one year notice of termination. On November 13, 1986, respondent filed a two-count petition seeking a declaratory judgment that appellants breached the lease by vacating the premises without properly giving one year advanced notice and seeking a judgment for unpaid rent due under the lease.

The trial court, after a bench-trial on November 30, 1987, held that the appellants did not breach the lease and that appellants properly terminated their obligations. This court reversed finding that the evidence clearly showed that the lease required appellants to give one year notice prior to ceasing their business operations and vacating the premises. *MRI Northwest Rental Investments I, Inc. v. Schnucks–Twenty–Five, Inc.*, 763 S.W.2d 375 (Mo.App., E.D.1989). Since we held that the appellants breached the lease, we remanded the case for a determination of whether appellants were liable to respondent for damages and, in this regard, whether respondent had fulfilled its duty to mitigate damages. *Id.* at 378.

On remand, the trial court concluded that respondent satisfied its duty to mitigate damages by reasonably attempting to relet the premises and awarded respondent the entire amount of unpaid rent through November 30, 1987, together with prejudgment interest, which amounted to a total of $219,297.46.[2] Appellants' appeal from this judgment asserting only that the court erred in finding that respondent satisfied its duty to mitigate.

■ Our review of this court-tried action is defined by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), which requires that we affirm the judgment of the trial

---

1. The two amended provisions of the lease are more fully set out in our court's previous decision in this same case. *MRI Northwest Rental Investments I, Inc. v. Schnucks–Twenty–Five, Inc.*, 763 S.W.2d 375, 376 (Mo.App., E.D.1989).

2. The Honorable Judge Robert H. Dierker, Jr., was assigned the case upon remand.

court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law or unless it erroneously applies the law. *Id.* at 32. For the following reasons, we do not find the court's judgment to be in error when measured by this standard of review.

In Missouri, a lessor is under no duty to mitigate his damages by seeking to relet the leased premises when the lessee abandons the premises prior to the expiration of a commercial lease, but may let the premises lie idle and collect the rents as they come due. *Hurwitz v. Kohm,* 516 S.W.2d 33, 37 (Mo.App., St.L.Dist.1974). The lessor has three alternatives in the event of a default or abandonment by the lessee: 1) Remain out of possession, treat the lease as subsisting and collect rent; 2) give notice to tenant, resume possession of the premises and attempt to relet in order to mitigate any damages; or 3) reenter, resume possession in its own right and, effectively, terminate the lease. *Hurwitz v. Kohm,* 594 S.W.2d 643, 646 (Mo.App., E.D.1980). While the parties on appeal did not dispute the trial court's finding that respondent was under a duty to mitigate, appellants assert in their brief that respondent's duty to mitigate commenced on March 23, 1985, when appellants vacated the premises. We cannot agree.

On March 12, 1985, appellants wrote respondent to inform it of their intention to terminate the lease and cease business operations. Respondent, in reply to appellants' letter, indicated its belief that appellants' termination was ineffective, was a breach of the lease and that the respondent intended to treat the lease as still being valid. Respondent reiterated its position in two subsequent letters on April 4, 1985, and July 9, 1985.

In a letter dated May 30, 1985, appellants informed respondent that they did not consider their notice of termination to be a breach of the lease and suggested to respondent that they attempt to locate a replacement tenant as soon as possible since "substantially higher rents should be obtainable." Respondent answered appellants' May 30, letter by stating, inter alia, that respondent would apply the rental of a replacement tenant, if any, to appellants' rental obligations as provided in the lease.

As the foregoing exchange indicates, respondent clearly evidenced its intention to treat appellants' attempt to terminate the lease as a breach of the lease and respondent sought to hold appellants liable under the terms of the lease. Indeed, appellants paid the agreed upon rental through March 15, 1986, the date on which appellants tried to terminate their obligations under the lease.

The lease, by its own terms, specified that respondent could reenter the premises upon a breach of the lease by appellant in order to relet the property and apply any such rental to the appellants' obligations. Specifically, the lease provided that:

In the event of any failure of Tenant to pay any rental due ... or any failure to perform any other of the terms, conditions or covenants of this lease to be observed or performed by Tenant ... or if Tenant shall abandon said premises ... then Owner besides other rights or remedies it may have, shall have the immediate right of re-entry ...

Should Owner elect to re-enter, as herein provided, ... it may either terminate this lease or it may from time to time without terminating this lease, make such alterations and repairs as may be necessary in order to relet the premises, and relet said premises or any part and at such rental or rentals and upon such other terms and conditions as Owner in its sole discretion may deem advisable; upon each such reletting all rentals received by the Owner from such reletting shall be applied, first, to the payment of any indebtedness other than rent due hereunder from Tenant to Owner; second, to the payment of any costs and expenses of such reletting, including brokerage fees and attorney's fees and of costs of such alterations and repairs; third, to the payment of rent due and unpaid hereunder, and the residue, if any, shall be held by Owner and applied in payment of future rent as the same

may become due and payable hereunder. . . . No such re-entry or taking possession of said premises by Owner shall be construed as an election on its part to terminate this lease unless a written notice of such intention be given to Tenant or unless the termination thereof be decreed by a court of competent jurisdiction. Notwithstanding any such reletting without termination, Owner may at any time thereafter elect to terminate this lease for such previous breach.

Appellants, on March 14, 1986, surrendered possession of the store to respondent and delivered the keys to the premises to respondent's agent. The utility service was discontinued on March 15, 1986. In response to this, respondent wrote appellants on March 24, 1986, and informed them that, since appellants had abandoned the premises, cut off the utilities and had delivered the key to respondent, respondent would accept possession of the premises in order to relet as provided in the lease. Respondent also indicated its intention not to terminate the lease. Respondent's actions were entirely consistent with Missouri law and the specific provisions of the lease itself.

The trial court recognized this by stating that the respondent assumed a duty to mitigate by accepting surrender of the keys and notifying appellants of its intention to attempt to relet the premises. Therefore, appellants' claim that the court erred in finding that respondent satisfied its duty to mitigate must take into consideration that respondent's duty arose on March 15, 1986.

■ Appellants assert that, since respondents refused to negotiate with prospective tenants, failed to list the premises with a broker, failed to advertise the rental or place a "for sale" sign on the premises, sought rental far exceeding the rental provided in the lease and unreasonably delayed in its attempt to mitigate, respondent should not have been awarded the full value of the overdue rent under the lease. We disagree.

On November 6, 1985, Greyhound Bus Station contacted respondent's Director of Shopping Operations and sought information about the premises, aspiring to locate a bus station there. The Director testified that Greyhound was undesirable as a tenant for the Northwest Plaza location because respondent was seeking another retail establishment to draw customers to the mall and that a Greyhound bus terminal would not attract retail customers and would create wear and tear upon the parking lot. On January 2, 1986, respondent was contacted by the Y.M.C.A. fitness center regarding the premises. Again, the Director stated that the Y.M.C.A. was not a retail establishment, nor the type of business which would attract shoppers to the center. Schnuck's Director of Real Estate Development admitted in testimony that Schnucks would not want a Y.M.C.A. next to one of their stores.

On November 5, 1986, the International Air Academy inquired regarding the Schnucks' location. International Air Academy sought to use the property for office space and, therefore, respondent determined that it would not be a suitable retail lessee. While appellants aptly point out that a portion of Northwest Plaza was leased out as office space, the evidence indicated that the existing office space was not located near the former Schnucks store and that respondent preferred that the subject of the lease at issue continue to be a retail operation. Indeed, respondent's concern with an ongoing, retail establishment was evidenced also by the continuous operation clause of the lease which required appellants to operate a retail grocery store for the entirety of the leased term.

Moreover, the section of the lease which permitted respondent to assume possession of the premises and attempt to relet, also provided that respondent could relet the premises upon such terms or conditions and for such rental as the respondent deemed advisable. This court has recognized that a similar provision enabled the lessor to attempt to relet the premises at a rental rate greater than that provided in the lease. *Collet v. American National Stores, Inc.,* 708 S.W.2d 273, 276–277 (Mo. App., E.D.1986); see also *Reget v. Demp-*

*sey–Tegler & Co.*, 70 Ill.App.2d 32, 216 N.E.2d 500, 503 (5th D.1966) (landlord not required to relet the premises for a different purpose if he reasonably believes that the new use will damage the premises.) We do not believe that it was unreasonable for respondent to insist upon a proper retail establishment for the vacated premises, given respondent's need to insure that the shopping center enjoy a steady flow of customers.

■ Appellants next claim that respondent should have listed the premises as available for rent with a broker, should have advertised in a local paper and should have placed "for sale" signs on the premises. In this regard, we note that the duty to mitigate does not require respondent to do everything imaginable in its attempt to secure a replacement tenant but only requires that the attempt be reasonable. *Kamada v. RX Group Limited*, 639 S.W.2d 146, 149 (Mo.App., E.D.1982).

■ Respondent's evidence showed that it was able to use in-house leasing, rather than local brokers, to locate tenants for some of its smaller rental properties. The Schnucks location involved in the present case was not a small property that would be handled in-house. However, respondent did engage two brokers who attempted to secure Silo and Best Buy, two discount retail companies, as replacement tenants.

It does appear from the evidence that one broker was mistakenly told that respondent would not pay his fee if he were to offer a tenant for the Schnucks location. However, the mere failure of a landlord to employ a leasing agent in order to relet the premises does not rise to a failure to mitigate damages, especially where, as here, the appellants present no evidence that respondent would have found a replacement tenant had an agent been utilized. *Kamada*, 639 S.W.2d at 149.

■ Similarly, while respondent did not advertise the property or place "for rent" signs on the premises, such a failure does not, necessarily, make the respondent's efforts to mitigate unreasonable. Respondent's testimony indicated that it

does not place a "for rent" sign on vacant retail properties because it gives the complex a negative image with potential lessees and customers of the shopping center. A similar business judgment decision by a landlord to not place rental signs on a vacant retail photography business was found to be reasonable by an Arizona appellate court in *Wingate v. Gin*, 148 Ariz. 289, 714 P.2d 459, 462 (Ct.App., 1985). In addition, respondent indicated that it had advertised vacant retail properties in the past without any success. Respondent's decision to not advertise was based, in part, on this past experience which led it to believe that advertising would not yield a replacement tenant. Appellants offered no evidence that advertising would have been successful.

We also note that respondent contacted several retailers in an attempt to relet the premises. Respondent's testimony indicated that it contacted T.J. Maxx, Marshall's, Service Merchandise and Toys ‹ R' Us, all large retail chains, regarding the Schnucks location. In addition, two different brokers helped try to secure leases from retailers, Best Buy and Silo. Respondent also was in contact with C.M.C. Stereo, a current tenant of Northwest Plaza in another part of the center, regarding the Schnucks location. As of the time of trial, negotiations continued with Toys R' Us and C.M.C. Stereo. The evidence is sufficient to sustain the court's judgment that respondent engaged in a reasonable effort to relet the premises.

Appellants make two final arguments regarding respondent's efforts to mitigate. Appellants claim that respondent unreasonably delayed before attempting to find a replacement tenant and that respondent did not satisfy its duty to mitigate because it sought to lease the premises for a rental rate in excess of that provided for in appellants' lease. We note, again, that respondent's delay, if any, is measured from March 15, 1986.

■ Respondent's Operations Manager testified that his effort to relet the premises began some time in "early 1986." The evidence also showed that the latest date

that respondent began its search for a tenant was in June of 1986. Respondent had, however, been contacted by prospective lessees prior to June of 1986. We cannot say that the trial court erred in finding a two to three month delay to be reasonable.

■ Respondent sought from $7.75 per square foot to as much as $12.00 per square foot in rent from prospective tenants. Respondent's testimony indicated that this was a fair market rental but was in excess of the $4.09 per square foot provided for in the appellants' lease.[3] Appellants do not dispute that the rent respondent sought was at the market rate, but argue that respondent's duty to mitigate required that respondent seek a replacement tenant at the same rate as the current lease. We do not agree.

The lease itself specifically stated that if respondent exercised its option to resume possession of the premises, respondent could seek to relet at such terms and at such rental as it deemed advisable. We do not wish to imply that this gives the respondent a roving commission to be unreasonable in trying to relet the premises. However, such language does indicate that the parties contemplated that the terms of a substitute lease, including the rental rate, could vary from the terms of the existing lease. See *Collet*, 708 S.W.2d at 276–277.

Appellants clearly recognized that a higher rental could be realized when they suggested in their letter of May 30, 1985, that "substantially higher rents should be obtainable when it sought to find a replacement tenant." In *Collet*, we found that a similar acknowledgment by the lessee helped defeat the lessee's claim that, by attempting to relet at a higher rental, the landlord accepted a surrender of the lease. *Id*. We do not believe that respondent acted unreasonably in seeking to lease property at the market rate. Other jurisdictions, when faced with a landlord seeking higher rent than that provided for in an existing lease, have held a landlord's attempt to obtain a market rate to be a

reasonable effort to mitigate. *Del E. Webb Realty and Management Co. of Colorado v. Wessbecker*, 628 P.2d 114, 116 (Colo.Ct. App., 1980); *Easterling v. Halter Marine, Inc.*, 470 So.2d 221, 224 (L.A.Ct.App., 1985); *United States National Bank of Oregon v. Homeland, Inc.*, 291 Or. 374, 631 P.2d 761, 767 (1981). The Supreme Court of Oregon most succinctly stated the rationale behind allowing the landlord to seek a market rate rental as follows:

> In order to mitigate the damages occasioned by a lessee's breach of a lease, the landlord should not be required to substantially alter his obligations as established in the pre-existing lease. Thus in the present case plaintiff was not required to rent the premises to persons not working in dentistry or related fields, since the offices were part of a dental clinic occupied by two other dentists and were designed for that special use. Nor should plaintiff be required to rent the premises below their fair rental value.

*Foggia v. Dix*, 265 Or. 315, 509 P.2d 412, 414–15 (1973).

In our case, respondent negotiated appellants' lease with the knowledge that appellants' business was a high volume operation which attracted many customers to respondent's shopping center. This was reflected in the rental rate negotiated which was, presumably, what the market would bear for a similar, large grocery retailer. It was reasonable to expect respondent to seek a replacement retailer at a market rental. This was recognized in appellants' lease and by appellants in their correspondence to respondent.

■ Appellants last claim that the burden of proving that respondent fulfilled its duty to mitigate damages should be upon the respondent since it is in the best position to produce evidence of its effort. We note that mitigation is an affirmative defense available to appellants and, as such, the appellants bear the burden of proof. *Whitehorn v. Dickerson*, 419 S.W.2d 713, 714 (Mo.App., Spld.1967); see also *Kama-*

---

**3.** The lease also provided a percentage rental of one and one-half percent of appellants' gross

receipts in excess of $3,666,667.00.

**538**

*da*, 639 S.W.2d at 149; *Wessbecker*, 628 P.2d at 116; *Bernstein v. Seglin*, 184 Neb. 673, 171 N.W.2d 247, 250 (1969).

We also point out that, in a commercial setting, the tenant is not as likely to be at a disadvantage regarding the availability of replacement tenants or of the efforts of its landlord to attempt to relet the premises. We do not believe that it is unjust to require appellants to prove that respondent could have relet the premises with greater efforts.

Since we find that the court did not err in finding that respondent undertook reasonable efforts to mitigate damages, the judgment of the trial court is affirmed.

CRIST, and AHRENS, JJ., concur.