IRONITE PRODUCTS CO., INC. & Gas Sweetner Associates, Inc., d/b/a Sulfatreat Company, Plaintiffs/Appellants,

v.

Alvin SAMUELS and Mark Samuels, Defendants/Respondents.

No. 73457.

Missouri Court of Appeals, Eastern District, Division One.

Dec. 8, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 18, 1999.

Application for Transfer Denied March 23, 1999.

Husch & Eppenberger, LLC, Michael H. Wetmore, Omri E. Praiss, St. Louis, for appellants.

Robert D. Blitz, Charles S. Kramer, James O. Hacking, III, St. Louis, for respondents.

PUDLOWSKI, Presiding Judge.

In 1972, Irwin Fox (Irwin) and Alvin Samuels (Alvin) agreed to form a business. Together they incorporated Ironite Products Co. (Ironite) to market a product discovered by Alvin, but patented by Irwin and Alvin. The articles of incorporation set forth all of the required guidelines for operation of Ironite. Orally Irwin and Alvin made additional decisions regarding Ironite's affairs. They orally agreed that: Irwin would run the Sales/Manufacturing components from Saint Louis and Alvin would work in Research and Development/Technical Services in New Orleans. Both divisions of the business would be equal and they would share decision making responsibilities. Recognizing that their business was divided into two equal spheres, each was to take equally from the company. If their businesses were successful, both would ask a son to join them in their respective offices. Irwin and Alvin never reduced

their agreement (1972 Oral Agreement) to writing.

Ironite marketed its product to the oil drilling industry until that market slowed. Irwin and Alvin incorporated another business, Gas Sweetners Associates, Inc., d/b/a Sulfatreat Company (Gas Sweetners), to market the same product to the natural gas industry.[1] This was an attempt to distinguish the product so they could utilize a different pricing scheme. Ironite and Gas Sweetners were separate entities in name and market only; they were functional equivalents.[2]

By 1989, Irwin and Alvin agreed that the corporations were stable and they each invited one son to join them as per the 1972 Oral Agreement. Both sons left other careers to join their fathers; Richard Fox (Richard) started work in the Saint Louis office while Mark Samuels (Mark) worked from the New Orleans office. Richard and Mark entered

their families's businesses with the understanding they would assume their fathers's positions. Around the time Richard and Mark joined the corporations, Richard requested that both Ironite and Gas Sweetners enter into written agreements regarding the structure, operation and succession issues. Both families agreed.

Richard drafted the documents to embody the prior incorporation instruments and the 1972 Oral Agreement. Effective 7 September 1990, the shareholders of Ironite and Gas Sweetners (collectively, the Companies) adopted bylaws. The proposed bylaws of each company empowered the Board of Directors to manage the Companies' business affairs[3] and to fix the salaries of the officers without limitation.[4] The Shareholders also entered into Restrictive Stock Agreements[5] for the Companies.

At this point in time, Alvin's intuition was that he could not trust Richard as he trusted

---

1. We were unable to locate the articles of incorporation of Gas Sweetners. However, at the time of oral argument, counsel informed us that Gas Sweetners is a Missouri corporation virtually identical to Ironite.

2. Counsel explained during oral argument that Ironite and Gas Sweetners recorded identical corporate minutes which only deviated by the designation of the corporate name.

3. Article III, Section One, is identical for the Companies:
   *General Powers* : The business and affairs of the corporation shall be managed by its Board of Directors.

4. Article IV, Section Nine, also is identical for the Companies:
   *Salaries* : The salaries of the officers shall be fixed from time to time by the Board of Directors and no officer shall be prevented from receiving such salary by reason of the fact that he is also a director of the corporation.

5. Article XV of Ironite provides that:
   (a) Unless otherwise agreed to by a majority of the Samuels Stockholders, the office of the technical services division of the Company shall be located in New Orleans, LA, and the office of the Vice–President and Secretary shall be held by a Samuels Stockholder.
   (b) Unless otherwise agreed to by a majority of the Fox Stockholders, the general business and administrative office of the Company shall be located in St. Louis, MO, and the office of the President shall be held by a Fox Stockholder.

   (c) The Stockholders agree to elect officers and directors who will cause the intents and purposes of this Restrictive Stock Agreement to be carried out. In addition, the Stockholders agree that fifty percent (50%) of the Directors shall be elected from among the Samuels Stockholders and fifty percent (50%) of the Directors shall be elected from among the Fox Stockholders.

   Similarly, Article XV of Gas Sweetners provides that:
   (a) Unless otherwise agreed to by a majority of the Samuels Stockholders, the office of the technical services division of the Company shall be located in New Orleans, LA, and the offices of the Vice–President of Research and Development and the Secretary and Assistant Secretary shall be held by a Samuels Stockholder.
   (b) Unless otherwise agreed to by a majority of the Fox Stockholders, the general business and administrative office of the Company shall be located in St. Louis, MO, and the office of the President and Administrative Vice–President shall be held by a Fox Stockholder.
   (c) The Stockholders agree to elect officers and directors who will cause the intents and purposes of this Restrictive Stock Agreement to be carried out. In addition, the Stockholders agree that fifty percent (50%) of the Directors shall be elected from among the Samuels Stockholders and fifty percent (50%) of the Directors shall be from among the Fox Stockholders.

Irwin. Therefore, Alvin informally spoke with a Louisiana attorney about the language in the proposed Bylaws and Restrictive Stock Agreements. From these conversations, Alvin modified the documents by making handwritten changes. The Fox shareholders accepted. All of the parties signed the incorporation documents, bylaw agreements and restrictive stock covenants which became the controlling corporate guidelines.

Thereafter, the relations between the two families declined. On 19 August 1993, Alvin wrote to Irwin and Richard suggesting they would benefit from an "objective tie-breaking director" in making business decisions for the Companies. Alvin subsequently filed suit seeking the appointment of a provisional director. Later in 1993, Irwin was killed in an automobile accident and Richard assumed his father's presidency of the Companies.

On 6 April 1994, the court appointed Gerald Greiman (Greiman) as a provisional director. Greiman voted to unequally compensate Richard and Alvin on 26 May 1994. Alvin protested, but before any action was taken, Greiman resigned his directorship. Clifford L. Goetz (Goetz) officially replaced Greiman as the provisional director on 1 January 1996. At the 16 May 1996 meeting, Goetz voted to equalize Richard and Alvin's salaries stating that he did not have enough information to make any other determination. In subsequent decisions, Goetz voted to unequally compensate Richard and Alvin and to move Mark from New Orleans to the Saint Louis office.

On 9 January 1997, Alvin and Mark (collectively, the Samuels) filed suit in New Orleans seeking equal salary payment and retaining Mark in the New Orleans office based on the long standing agreements of the Companies. The Companies then filed this suit in Saint Louis seeking declaratory judgment that the Board of Directors had authority to make decisions by exercising its business judgment in the best interest of the Companies. By mutual consent, all parties agreed to only

proceed with this action; the New Orleans suit was dismissed. Following all of the evidence, the trial court entered its findings of fact and conclusions of law. The trial court found, *inter alia*, that the two directors were required to be equally compensated and that Mark was guaranteed his position in New Orleans. This appeal followed.

On appeal from this court tried case, the evidence is viewed in the light most favorable to the trial court's judgment. *Nixon v. Lichtenstein*, 959 S.W.2d 854, 856 (Mo.App. E.D.1997). Unless the trial court's judgment has no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law or it erroneously applies the law, we will affirm. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). For the various reasons discussed herein, we reverse and remand. The Companies raise three points on appeal and the Samuels respond with six points.[6]

In its first point on appeal, the Companies posit that the trial court erred in ruling Richard and Alvin had to be equally compensated regardless of job performance. The Companies believe that this was error because the decision of the trial court contradicted the bylaws and was against the weight of the evidence. The Samuels respond that the trial court did not commit error in looking beyond the Companies' bylaws because the 1972 Oral Agreement neither added to nor varied the bylaw provisions and that the introduction of this evidence was not objected to at trial.[7]

■ From the evidence we find that the trial court improperly allowed evidence of the 1972 Oral Agreement to contradict the Companies' bylaws. We construe the corporate articles and bylaws pursuant to the general rules of contracts. *DCW Enterprises v. Terre du Lac Ass'n*, 953 S.W.2d 127, 130 (Mo.App. E.D.1997). Extrinsic evidence of a prior agreement generally is not admissible

6. We remind the attorneys to review the dictates of *Thummel v. King*, 570 S.W.2d 679 (Mo. banc 1978) when drafting their points relied on.

7. Both parties argue multiple facets of their arguments in the alternative. We decline to address every contention raised when the main argument is germane and controlling. Further discussion would not serve any precedential value.

to vary, add, or contradict terms of an unambiguous and complete written document. *Division of Youth Services v. Hopson*, 933 S.W.2d 917, 921 (Mo.App. W.D.1996). The parol evidence rule is not a rule of evidence; it is a rule of law. *Brewer v. Devore*, 960 S.W.2d 519, 522 (Mo.App. S.D.1998). If evidence is received, with or without objection, it violates the parol evidence rule and the decision must be made solely on the writing; parol evidence may not be considered. *Id.*

In an effort to substantiate the trial court's judgment, the Samuels argue that the 1972 Oral Agreement was not an attempt to modify the Companies' bylaws; rather, it was an exercise of the Companies' authority to enter into employment and compensation agreements with their officers and employees. The Samuels contend that if the 1972 Oral Agreement was not admissible, as a matter of policy, neither company would be able to enter into binding compensation agreements. We do not find this argument persuasive.

■ In the 1972 Oral Agreement, as testified to by Alvin, he and Irwin were to take equally from the Companies. However, when the written documents were drafted, discussed and signed by all of the parties, the compensation for the officers was clearly stated to be at the discretion of the Board of Directors. "Parol evidence is not admissible to prove a condition precedent if the condition varies, negates, or contradicts the express terms of the writing." *Union Elec. Co. v. Fundways, Ltd.*, 886 S.W.2d 169, 171 (Mo. App. E.D.1994). Since the 1972 Oral Agreement directly contradicts the terms of the bylaws, the prior agreement violated the parol evidence rule and, accordingly, that evidence must be ignored. We agree with the Companies' point.

■ In its second point on appeal, the Companies' argue that the Board of Directors had the authority to reorganize the structure of the Companies and could relocate Mark to the Saint Louis office. The Companies conclude that the restrictive stock agreements only limit the location of the office of Research and Development/Technical Service. We agree.

■ We look to the Companies' bylaws to determine the authority granted to their Board of Directors. Article III, Section One of the Companies' bylaws clearly sanctions the Board of Directors to manage the business and affairs of the Companies. The Board of Directors is limited by the restrictive stock agreements which state that the respective offices must be maintained in Saint Louis and in New Orleans. We will not interfere with the decisions of the Board of Directors absent fraud, illegal conduct, or an irrational business judgment. *Neidert v. Neidert*, 637 S.W.2d 296, 301 (Mo.App. S.D.). In making decisions, the Board of Directors is required to use its best independent discretion and judgment. *Id.* Goetz and Richard both articulated rational reasons to relocate Mark to the Saint Louis office and to implement the organizational changes of the Companies. We will not interfere with that decision, despite a possible detriment to the corporations.

There is no allegation that the Board of Directors perpetrated fraud or made an irrational business judgment. The only accusation is that the Board of Directors lacked the authority to implement its decision. Clearly, the Board of Directors may decide all aspects of the Companies' business affairs unless prohibited by the bylaws. The Samuels assert that the restrictive stock agreements, which are virtually identical for Ironite and Gas Sweetners, when read in conjunction with prior oral agreements, forbid the Board of Directors from implementing any organizational changes which would move Mark to Saint Louis.

■ Prior to admitting extrinsic evidence, we look to the documents to determine if an ambiguity exists. *Stewart Title Guar. Co. v. WKC Restaurants Venture Co.*, 961 S.W.2d 874, 881 (Mo.App. W.D.1998). We will not allow parol evidence to create an ambiguity in order to distort the clear language of the document. *Rodriguez v. General Acc. Ins. Co.*, 808 S.W.2d 379, 382 (Mo. banc 1991). In the instant case, the written documents clearly state that the office of the technical services division is to be located in New Orleans, but it does not denote a location for the Companies' Secretary which is

the position held by Mark. He additionally works in the Technical Office, and Alvin supervises that office. Obviously, Alvin is required to remain in New Orleans to administer that office, however, the document does not address the requirement that Mark must reside in New Orleans. However, the Board of Directors is given complete authority to conduct the business. When Mark ascends to his father's position, he will be guaranteed location in New Orleans. Until that time, the Board may reorganize for the best interests of the Companies. This was a proper use of the Board of Directors' business judgment. The Companies' final point on appeal is an argument in the alternative and, because of our holding, is rendered moot.

The Samuels raise three points on appeal in an attempt to support the judgment of the trial court. We do not find their arguments compelling. They claim the Companies are estopped from arguing the agreements are not enforceable or do not provide for the agreed upon corporate and salary structure, or promise Mark employment in New Orleans. The Samuels then argue that the Companies misplace their reliance upon the business judgment rule. However, as we have previously found, the 1972 Oral Agreement was extrinsic evidence which was improperly admitted to contradict the subsequent written documents, and therefore, the Board of Directors properly exercised its decision making authority under the business judgment rule.

Finally, the Samuels state that the judgment of the trial court should be affirmed due to Richard's failure to appeal. The Companies are bound by the ruling of this Court and, hence, Richard, as President, Director and Stockholder, owes a fiduciary duty to the Companies to implement this judgment.

The judgment of the trial court is reversed.

WILLIAM H. CRANDALL, Jr., Judge, and CLIFFORD H. AHRENS, Judge, concur.