**JCBC, L.L.C., Respondent,**

v.

**ROLLSTOCK, INC., Appellant.**

**No. WD 57285.**

Missouri Court of Appeals,
Western District.

June 6, 2000.

Rehearing Denied Aug. 1, 2000.

Kelly C. Tobin, Anthony L. Gosserand, Kansas City, for Respondent.

Joe B. Whisler, Rodney A. Ames, Kansas City, for Appellant.

Before: EDWIN H. SMITH, P.J., and HOWARD and HOLLIGER, JJ.

EDWIN H. SMITH, Presiding Judge.

Rollstock, Inc., appeals the judgment of the Circuit Court of Jackson County, Missouri, for the respondent, JCBC, L.L.C., after a judge-tried case, on the respondent's claims against it for breach of lease and for conversion.

The appellant raises two points on appeal, Point I dealing with its breach of lease claim and Point II dealing with its conversion claim. In Point I, it claims that the trial court erred in awarding the respondent damages of $17,445.95, representing five months rent due and payable under the terms of the defaulted lease, because there was no substantial evidence to support such an award in that it was undisputed that the respondent had mitigated its damages in the amount of $16,800 by taking possession of and reletting the premises for the five months for which rent was due. In Point II, it claims that

the trial court erred in finding for the respondent on its "conversion" claim for damages or in the alternative for the return of certain personal property taken by the appellant when it vacated the premises because there was no substantial evidence to support such a finding and it was against the weight of the evidence in that the evidence was insufficient to establish that the respondent owned or had a right to possession of the property in question.

We affirm in part and reverse and remand in part.

### Facts

Prior to 1996, John and Beverly Cremer, the sole shareholders and owners of the respondent company, owned Integrated Industrial Services (I²S), which was the predecessor in interest to the appellant. I²S conducted its business at 1951 Television Place, Kansas City, Missouri. In 1994, I²S entered into a real estate contract to buy the building at 1951 Television Place from Allied Tile Company (Allied). However, the sale was closed in the name of the respondent, rather than I²S. Pursuant to the contract, Allied sold to the respondent, in addition to the real estate and the improvements thereon, certain personal property, including "furniture items with granite or marble enhancements which includes two (2) executive desks and five (5) credenzas."

In January 1997, the parties entered into a lease agreement, with the appellant agreeing to lease the building at 1951 Television Place from the respondent on a

month-to-month basis at the rate of $3,489.19 per month.[1] Pursuant to their lease agreement, the appellant agreed to give written notice of six months before vacating the premises. On November 4, 1997, the appellant notified the respondent of its intention to vacate the premises at the end of December 1997, which it did.

When the appellant vacated the premises, it took the two executive marble desks and five marble-top credenzas that it had been using in its business while leasing the building. The respondent claimed that it owned the marble furniture, pursuant to its contract with Allied, and requested that the items be returned to it. The appellant, claiming that it owned the marble furniture, refused.

Soon after the appellant vacated the premises, the respondent hired a real estate broker to find a new tenant. On February 13, 1998, as a result of the broker's efforts, the respondent entered into a five-year lease agreement with Van–Wall Equipment, Inc. (Van–Wall). The lease provided that Van–Wall would pay $2,400 rent for the month of February 1998, then would pay $4,800 per month for the next year, with the rental payments to increase each year, as provided in the lease. In addition, the lease provided for a broker's commission, which was to be equal to six percent of the total rental to be received from Van–Wall over the five-year period, which resulted in a commission of $18,248.40.

---

1. The record reflects that there was a written lease prior to this time that had apparently expired. We glean this from the letter of Peter R. Tolley, the attorney for the appellant, of December 6, 1996, to Beverly Cremer, which stated:

    In reviewing the Lease between I²S and JCBC, we have decided to continue the lease on a month-to-month basis rather than a written lease.

    Jim has asked that you forward your mortgage payment book to us and we will make the mortgage payment on the building direct.

As to the month-to-month agreement, the appellant's attorney stated in a letter to the Cremers, dated January 29, 1997:

    This will confirm the agreement between Rollstock, Inc., a Michigan corporation, and you with respect to the month-to-month lease of your building at 1951 Television Place, Kansas City, Missouri. Rollstock, Inc. is leasing the building on a month-to-month basis. Rollstock, Inc. has agreed with you that it will give you six month[s] advance notice of its intent to terminate the leasehold and/or vacate the premises.

On February 19, 1998, the respondent filed its two-count petition in the Circuit Court of Jackson County, Missouri, for breach of its lease with the appellant seeking damages and for conversion for its unauthorized taking of the marble furniture seeking damages or in the alternative for the return of the furniture. On March 24, 1998, the appellant filed its answer in which it asserted, *inter alia*, the affirmative defense that the respondent had failed to mitigate its damages.

The case was tried to the court on March 8, 1999. On March 22, 1999, the trial court issued its judgment finding for the respondent on both counts of its petition. On the breach of lease count, the court awarded the respondent damages in the amount of $17,445.95, the exact amount of five months rent. On the conversion count, the trial court ordered the appellant to return the marble furniture to the respondent, finding that the respondent owned it and was entitled to immediate possession.

On April 21, 1999, the appellant filed a motion to amend the judgment on the ground that the trial court had failed to credit it with the rent paid by Van–Wall to the respondent for the five months for which the respondent was seeking damages for rent due, which motion the trial court denied.

This appeal follows.

### Standard of Review

■ Our review of a court-tried case is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. *banc* 1976). *Business Men's Assurance Co. of America v. Graham*, 984 S.W.2d 501, 505 (Mo. *banc* 1999). As such, we will affirm the trial court's judgment for the respondent unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Business Men's Assurance Co.*, 984 S.W.2d at 505–06.

### I.

In Point I, the appellant claims that the trial court erred in awarding the respondent damages of $17,445.95, representing five months rent due and payable under the terms of the defaulted lease, because there was no substantial evidence to support such an award in that it was undisputed that the respondent had mitigated its damages in the amount of $16,800 by taking possession of and reletting the premises for the five months for which rent was due. On appeal, the appellant does not contest the fact that it breached its lease with the respondent by failing to give the required six-months written notice of termination or the fact that, as a result, it left owing five months in rent, totaling $17,-445.95. What it contests is the fact that it owes this amount in damages for breach of its lease in that it is entitled to a credit of $16,800 in mitigation of damages as a result of the respondent's taking possession of and reletting the premises and receiving rent in that amount from the new tenant for the five months in question.

■ "A lease cannot be terminated by the unilateral act of the tenant." *Brywood Ltd. Partners, L.P. v. H.T.G., Inc.*, 866 S.W.2d 903, 905 (Mo.App.1993). Under Missouri law, when a tenant defaults on a lease, the landlord has three options: " '(1) [r]emain out of possession, treat the lease as subsisting and collect rent; (2) give notice to tenant, resume possession of the premises and attempt to relet in order to mitigate any damages; or (3) reenter, resume possession in its own right and, effectively, terminate the lease.' " *Blue Ridge Ctr. Ltd. Partnership v. Zadeh*, 943 S.W.2d 357, 358 (Mo.App.1997) (*quoting MRI Northwest Rentals Invs. I, Inc. v. Schnucks–Twenty–Five, Inc.*, 807 S.W.2d 531, 534 (Mo.App.1991)). Although, generally, a landlord has no duty to mitigate damages, once it accepts possession of the property and notifies the tenant of its intention to attempt to relet the property, the landlord voluntarily assumes a duty to mitigate, as the second option reflects. *Id.*

at 359. Once a lessor accepts the duty to mitigate damages, although it "is not required to do everything imaginable" to do so, its attempts must be reasonable. *Brywood Ltd. Partners, L.P.*, 866 S.W.2d at 907. The tenant has the burden of proving that a lessor failed to take such reasonable steps to mitigate damages. *Blue Ridge Ctr. Ltd. Partnership*, 943 S.W.2d at 359.

█ Here, there is no dispute that the respondent took possession of and relet the premises in question to a new tenant before the expiration of the defaulted lease, thereby choosing the second option, discussed, *supra*. *Id.* at 358. As such, as the appellant pled as an affirmative defense, it was entitled to credit against the rents due of $17,445.95 for the rental payments received from the new tenant for the balance of the term of the old lease. In this regard, the record reflects that the new tenant paid the respondent $2,400 for the month of February 1998, and $4,800 for each of the following three months, for a total of $16,800. Thus, against the rent due of $17,445.95, the appellant was entitled to a credit for mitigation of damages of $16,800, leaving a balance due of $645.95, which would have been the correct amount of the trial court's award, unless we accept the respondent's argument, *infra*, that its damages included more than just the five months in rent due under the defaulted lease.

The respondent contends that, even if the rent due from the appellant was required to be reduced by the rent received from the new tenant in mitigation of damages, the trial court's award of damages is still supported by the evidence. In this respect, the respondent asserts that any payments it received from the new tenant should be first "applied to the costs incurred to obtain the rents and then the remaining amount, if any, . . . applied towards the rents due." Specifically, it claims that the commission of $18,248.40 paid to the real estate broker for securing the five-year lease with the new tenant is recoverable against the appellant.

The respondent cites no Missouri cases supporting the proposition that a landlord can recover the expenses of reletting leased premises in mitigation of its damages against a defaulting tenant, and we can find none. However, the RESTATEMENT (SECOND) OF PROPERTY § 12.1 cmt. i (1977) does provide that, if the landlord chooses to relet the property to mitigate the damages against a defaulting tenant, "the tenant is liable for the difference between the rental the tenant was obligated to pay and the amount received from the new tenant, and is also liable for the reasonable costs incurred by the landlord to procure a new tenant." To the extent necessary to prevent, in our view, the obvious injustice of a defaulting tenant from receiving the benefit of the landlord's reletting of the property without requiring him or her to be responsible for any expense incurred by the landlord in actual mitigation of his or her damages, we would adopt the Restatement position to the extent discussed, *infra*.

In our case there is a question as to whether the broker's commission, in whole or part, should be includable as part of the respondent's damages as a reasonable cost of reletting the property in mitigation of the same. The respondent contends that it should be, asserting that it would not have employed a broker if it had not felt obligated to relet the property immediately in order to mitigate its damages. Rather, it would have attempted to relet the premises using its own efforts. This argument ignores two rather significant facts not in dispute. First, the broker's commission was based on a percentage, six percent, of the rents to be received for the entire period of the new lease, five years, not just for the five months owed on the defaulted lease. Thus, even though the appellant would only be receiving a benefit by way of mitigation of damages as to the first five months of the new lease, it would be forced to pay the commission for the full five years of the new lease. Second, in incurring the cost of the commission, the

respondent actually enhanced its damages rather than mitigating them. This is so in that without the reletting of the property, the respondent's total damages would have been $17,445.95, the amount of five months rent due and owing upon default. However, with the reletting, including the broker's commission, the respondent's damages would have been computed, under the respondent's reasoning, by adding the rent due, $17,445.95, and the total commission, $18,248.40, and subtracting the rent collected from the new tenant, $16,800, resulting in damages of $18,894.35, or $1,448.40 *more* than if the respondent had not *mitigated* its damages. As a matter of law, and common sense, such damages would not be allowed under the guise of the reasonable cost of reletting property in "mitigation" of a landlord's damages against a defaulting tenant. Given these circumstances and assuming that the trial court would find that the broker's commission was a cost actually incurred in mitigation of damages, it is our opinion that the respondent would be entitled, at most, to $1,008 as a reasonable amount of damages for the cost of the broker's commission. We arrive at this figure by multiplying the rent due from Van–Wall for the five-month period remaining on the defaulted lease, $16,800, by the six-percent commission provided for in the new lease. This has the effect of apportioning the benefit received by the appellant from the mitigation of the respondent's damages as a result of its hiring of a real estate broker to obtain a new tenant.

Although the parties did not request findings under Rule 73.01(a),[2] and the trial court did not make any findings of fact and conclusions of law on the issue of how it arrived at the amount of its award of damages, there can be no mistake, given the fact that the court's award was the exact amount of the five months rent requested by the respondent in its petition,

that it did not give credit for the rent paid by the new tenant in mitigation of damages, as it was required to do. Consequently, despite the argument of the respondent on appeal to the contrary, it is obvious that the trial court's award of damages, $17,445.95, was for the rent due under the defaulted lease, without credit for mitigation of damages, and it never considered whether the real estate broker's commission was incurred as an expense of the same and if so, the amount thereof that was "reasonable" for that purpose. And, although under Rule 84.14, we are permitted to enter the judgment that should have been entered by the trial court, we can only do so where the record permits. *Coffman v. Powell,* 929 S.W.2d 309, 312 (Mo.App.1996). Here, the record is not sufficiently developed on the issue in question to allow us to enter judgment with any degree of confidence in its reasonableness, fairness, and accuracy. *Id.* Consequently, we must reverse the judgment for the respondent for damages for breach of lease and remand for further proceedings on the issue of damages in accordance with the legal principles discussed.

## II.

In Point II, the appellant claims that the trial court erred in finding for the respondent on its "conversion" claim for damages or in the alternative for the return of certain personal property taken by the appellant when it vacated the premises because there was no substantial evidence to support such a finding and it was against the weight of the evidence in that the evidence was insufficient to establish that the respondent owned or had a right to possession of the property in question. We disagree.

▬ Initially, we would note that in the "conversion" count of its petition, the respondent sought damages for the appel-

**2.** All rule references are to the Missouri Rules of Civil Procedure (1999), unless otherwise

indicated.

lant's removal of the personal property in question when it vacated the premises or in the alternative for the return of the property. The trial court awarded it the return of the property. Although a plaintiff in a replevin action may seek either the return of the property or damages, in a conversion action, his or her remedy is for damages, not the return of the property. *St. Louis Fixture & Show Case Co. v. F.W. Woolworth Co.*, 232 Mo.App. 10, 88 S.W.2d 254, 263 (1935). In any event, the appellant does not challenge on appeal the designation by the respondent of its claim as one in conversion. In addition, the requisite elements of proof for the two theories of recovery are the same: "(1) that the plaintiff is entitled to possession of the property; (2) that the defendant exercised unauthorized control over the property; and (3) that the defendant deprived the plaintiff of its right to possession." *First Nat'l Bank of Steeleville, Nat'l Ass'n v. Erb Equip. Co.*, 972 S.W.2d 298, 300 (Mo. App.1998). As a consequence, the designation of the respondent's claim as one for conversion, as opposed to replevin, has no bearing on our disposition of this appeal.

■ In the conversion count of its petition, the respondent alleged, *inter alia*, that it was "the owner of certain personal property, including two executive marble desks and 5 marble top credenzas with an approximate fair market [value] in excess of ten thousand and no/100 Dollars ($10,-000.00)." It further alleged that, although the appellant was given permission to use the personal property during its lease, it was expressly advised not to take it when it vacated the premises, but nonetheless did so. The trial court, in ordering the return of the furniture to the respondent, found that it owned the furniture in question and was entitled to possession. The appellant claims on appeal that this finding was not supported by the evidence. Thus, the issue for us to decide is whether the evidence was sufficient for the trial court to find that the respondent owned the

marble furniture and, as such, was entitled to immediate possession of the same.

In claiming ownership of the furniture, the appellant relied at trial on the testimony of Beverly Cremer as to the transfer of ownership of the assets of I²S to NuCorp Industries, Inc. (NuCorp), and the subsequent transfer to Rollstock from its predecessors in interest, NuCorp and CMS, Inc. (CMS); the security agreement of October 11, 1995, entered into between I²S and NuCorp securing a loan; and the "Voluntary Surrender Agreement" of October 30, 1996, entered into between I²S, NuCorp and CMS. The security agreement provided, in pertinent part:

> For value received, [I²S] grants to [NuCorp] a security interest in the following described property ("Collateral"):

> All accounts receivable, all inventory, equipment, fixtures and leasehold improvements currently in the possession of [I²S] at the business location of 1951 Television Place, Kansas City, MO 64126, as well as any inventory acquired after the date hereof and present at the date of close, all supplies of items, including those in Inventory, used or useful in connection with [I²S's] business, all furniture, fixtures, equipment, and machinery used in [I²S's] business, and any and all assets owned by [I²S's] business at 1951 Television Place, Kansas City, MO 64126, including without limitation, contract rights, purchase orders, phone numbers, trademarks, trade names and other tangible and intangible assets, and the proceeds from the sale of any of [I²S's] assets.

In the surrender agreement, I²S and NuCorp acknowledged and agreed that they had "defaulted on their obligations and indebtedness to [CMS] and that all such indebtedness and obligations [were] due and payable in full." They also acknowledged and agreed that CMS held "valid, enforceable and properly perfected security interests in ... all collateral owned or held by [NuCorp]." Having made such acknowledgements and agreements, I²S

and NuCorp "surrender[ed] and turn[ed] over to [CMS] all collateral, including all their accounts, accounts receivable, contract rights, general intangibles, inventory, machinery, equipment, furniture and fixtures." Distilling the appellant's argument down to its essence, it is contending that I$^2$S owned the furniture in question at the time the security agreement was entered into between I$^2$S and NuCorp and therefore, as a result of the subsequent transfers of ownership testified to by Mrs. Cremer and the surrender agreement between I$^2$S, NuCorp and CMS, ownership of the marble furniture was transferred to it, entitling it to possession. In this regard, logically and legally, I$^2$S and its successors could only have transferred the ownership of the furniture through the security and surrender agreements to the appellant, as it contends, if I$^2$S, in fact, owned it at the time the security agreement was entered into. As such, the appellant would own the marble furniture, as it contends, only if I$^2$S owned the property on October 11, 1995.

The respondent contends that it, not the appellant, owned the furniture when the security agreement in question was entered into. In claiming ownership of the furniture as of October 11, 1995, the respondent relies on the sale to it of the leased premises by Allied pursuant to the "Commercial and Industrial Real Estate Sale Contract," which, as discussed, *supra*, provided not only for the sale of the real estate, but the improvements thereon, and the personal property used in the operation of the buildings and improvements, including "furniture items with granite or marble enhancements which includes two (2) executive desks and five (5) credenzas." The contract was entered into on January 15, 1994, with the closing occurring on February 25, 1994. Although the contract was entered into between Allied and I$^2$S, Mrs. Cremer testified and the warranty deed, admitted at trial, reflects that the property was sold to the respondent. The record does reflect that I$^2$S did purchase some personal property from Allied on December 6, 1993, as evidenced in a letter of that date from Mrs. Cremer to David Bray of Allied. However, the list of items agreed upon for purchase did not include the marble furniture in question. We find that this evidence was sufficient for the trial court to conclude that the marble furniture was sold to the respondent by Allied on February 25, 1994, such that its ownership was unaffected by the security and surrender agreements relied upon by the appellant to establish ownership. Hence, the trial court did not err in finding that the respondent was entitled to the possession of the marble furniture and ordering its return to the respondent.

■■■■ The appellant asserts that, under the parol evidence rule, the trial court, in determining ownership of the furniture, was prohibited from looking beyond the four corners of the security and surrender agreements, which it contends established its ownership of the furniture. The parol evidence rule "provides that complete and unambiguous written contracts cannot generally be varied, added to or contradicted by extrinsic evidence," except in cases involving fraud, accident, mistake, duress, or mental incapacity. *J.R. Waymire Co. v. Antares Corp.*, 975 S.W.2d 243, 247 (Mo. App.1998). It "is a substantive rule that limits the evidence from which inferences may be drawn and which, in turn, defines the limits of the contract." *Poelker v. Jamison*, 4 S.W.3d 611, 613 (Mo.App.1999). As the rule's definition suggests, parol evidence may be admitted to help explain or construe the terms of an ambiguous contract. *Jamieson–Chippewa Inv. Co. v. McClintock*, 996 S.W.2d 84, 88 (Mo.App. 1999). "Whether a contract is ambiguous is a question of law to be determined by the court." *Id.* at 89. "A contract is ambiguous only if its terms are reasonably open to more than one meaning." *Id.* "We will not allow parol evidence to create an ambiguity in order to distort the clear language of the document." *Ironite Prods. Co. v. Samuels*, 985 S.W.2d 858, 862 (Mo.App.1998). The parol evidence rule

did not work here to prohibit the trial court from considering the respondent's evidence as to the ownership of the furniture at the relevant times of inquiry. This is so inasmuch as the security and surrender agreements in question on their face do not establish ownership of any specific personal property, as argued by the appellant, but only indicate that whatever such property was owned was subject to the agreements.

Point denied.

### Conclusion

The judgment of the circuit court ordering the appellant to return to the respondent the marble furniture is affirmed. Its judgment awarding damages of $17,445.95 to the respondent for breach of lease is reversed and the cause remanded for further proceedings in accordance with this opinion on the sole issue of damages.

HOWARD and HOLLIGER, JJ., concur.