Linda JACKSON, Appellant,

v.

Duane O'DELL, et al., Respondents.

No. WD 45653.

Missouri Court of Appeals,
Western District.

Feb. 2, 1993.

Motion for Rehearing and/or Transfer to
Supreme Court Denied
March 30, 1993.

Application to Transfer Denied
May 25, 1993.

Ricky Cornelison and O.C. & C. Builders, Inc. for damages related to construction defects in the home she purchased. Because O.C. & C. Builders, Inc. ("OCC") was an insolvent corporation at the time Ms. Jackson brought suit, she sought to hold Mr. O'Dell and Mr. Cornelison personally liable. The trial court awarded her $6,000.00 in damages against OCC for breach of implied warranty of fitness. The court entered judgment for O'Dell and Cornelison on plaintiff's claims. Plaintiff Jackson appeals, contending the court erred in refusing to enter judgment against O'Dell and Cornelison, and in denying her relief on her additional claim of breach of contract for failure to purchase home buyer's warranty insurance.

The principal contention of appellant is that the trial court erred in refusing to find individual defendants O'Dell and Cornelison liable for plaintiff's damages. Plaintiff argues that the court should have "pierced the corporate veil" to avoid the injustice of an uncollectible judgment. Since this case was tried to the court, we review the judgment with an eye to determining whether the judgment is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

*Factual Background*

On June 5, 1985, Linda Jackson entered into a contract for the purchase of a home to be constructed on a lot in Clay County. The contract was arranged through a realtor. Plaintiff Jackson understood that the house would be constructed by OCC.[1] All of Ms. Jackson's actual face-to-face contacts with any of the principals of OCC were after the contract was signed. William Crispin, who is not a party defendant in the case and is deceased, was the president of OCC. Crispin, O'Dell and

Jeffrey P. Hiles, Ramsay, Ford & Hiles, P.C., Kansas City, for appellant.

Larry K. Enkelmann, Gladstone, for respondents.

Before BERREY, P.J., and ULRICH and SMART, JJ.

SMART, Judge.

This case arises out of a contract for the construction of a home. Linda Jackson brought an action against Duane O'Dell,

---

1. The contract could perhaps be considered ambiguous as to the identity of the seller/builder. The contract refers to OCC as seller but is signed by the three individuals without a designation that they were signing in a corporate capacity. Appellant Jackson now argues the court erred in finding that the corporation was the party contracting with Ms. Jackson. This argument falls, however, in the light of the evidence that plaintiff Jackson understood she was dealing with OCC, rather than with Crispin, O'Dell and Cornelison. There was no evidence that she was misled, or that she understood her negotiations were with a partnership.

Cornelison were directors of the corporation. Cornelison resigned his employment and his directorship with the corporation after the contract with Ms. Jackson was signed, but before the closing. Some of the costs of constructing the Jackson house were paid out of funds of a partnership which consisted of Cornelison, O'Dell and Crispin, which was also engaged in the business of building homes. The balance of the costs of constructing the home was paid out of the funds of the corporation. The corporation ceased doing business some time after the construction of Ms. Jackson's house, and the corporation charter was forfeited.

Ms. Jackson discovered some construction defects after she took possession. She made demand on OCC to repair the deficiencies. Some efforts were made to repair some of the defects before the corporation ceased operating, but the defects were not satisfactorily repaired. Although the contract with OCC indicated that the builders would provide home buyer's warranty protection, the premium for this protection was not paid out of the proceeds of the closing. When plaintiff discovered the coverage had not been purchased, the coverage was no longer available.

### Piercing the Corporate Veil

■ The corporation laws are designed to provide investors with protection from personal liability upon compliance with specific statutory provisions. As a general rule, the corporation's separate legal identity must be observed, even though a creditor of an insolvent corporation may suffer loss by virtue of a court's adherence to the separate identity. Of course, there are times when corporate officers and directors have so greatly abused the corporation's legal existence that equity demands that the corporate veil be pierced.

■ It is not necessary to thoroughly discuss all of the applicable legal principles involved in piercing the corporate existence, since there are many authorities which delineate the principles. This case is resolved by examination of the evidence in the light of the principle that the corporate existence may be disregarded for purposes of liability only when the evidence shows that the persons in control of the corporation used the corporate cloak "as a subterfuge to defeat public convenience, to justify wrong or to perpetrate fraud." *Fairbanks v. Chambers,* 665 S.W.2d 33, 37 (Mo. App.1984).

> If the corporate affiliation is devised as being used to perpetrate fraud or injustice or accomplish some unlawful purpose, equity will interpose to tear down technical legal barriers and pierce through the corporate veil ... Examples of such wrongs as would satisfy this standard include actual torts, violations of statutory duties, under-capitalization, or the stripping of assets from the subservient corporation.

*Collett v. American Nat. Stores, Inc.,* 708 S.W.2d 273, 286 (Mo.App.1986) (citations omitted) (allowing the corporate veil to be pierced where evidence showed subsidiary corporation was "grossly under-capitalized" according to industry standards).

■ In this case, the evidence did not compel a finding of liability on the part of Mr. Cornelison and Mr. O'Dell. Although the corporation was formed with only $600.00 of stock subscriptions, it was apparent from the start that each of the three shareholders would be required to personally guarantee any loans obtained from the bank for the construction of houses. Thus, each shareholder would have a substantial personal stake in the success of the corporation, as though a larger amount of capital had been contributed. There was no testimony that there was anything unusual about the capital structure, or that it was contrary to industry standards. Nor was there any evidence that the three principals intended to engage in devious business practices, and to close up the business as soon as the claims began to accumulate. Rather, the evidence was consistent with the finding of the trial court that this was a case of the failure of a corporation which "the owners hoped would do well and give them a vehicle to make a good living with." There was no evidence that the owners attempted to drain the corporation, to the

detriment of plaintiff. Nor is there evidence that the owners used the corporation for deceptive purposes or employed devious means in operating the corporation. Although there were some deficiencies with the house which was built for plaintiff, the evidence did not show the house to be of such poor quality that one could presume intent to defraud.

The fact that the O'Dell, Crispin, Cornelison partnership lent money to the corporation for construction purposes shows nothing improper. The fact that the land on which the house was constructed (and on which other houses were constructed for other buyers) originally belonged to O'Dell and Cornelison rather than the corporation, is of no consequence. The officers and directors were free to deal with the corporation. The fact that the land was transferred to the corporation for no consideration was not detrimental to the corporation, as noted by the trial court, but was beneficial to the corporation. The fact that Mr. O'Dell was paid by the corporation for subcontract work done at various times was also of no consequence, since there was no evidence that the payments were unreasonable or improper in any way.

For all the foregoing reasons, this court holds that the trial court did not err in finding that the corporation, rather than the individual defendants, were liable to plaintiff for breach of implied warranty of fitness.

### Failure to Provide Home Buyer's Warranty Insurance

■ Ms. Jackson next contends that the court erred in granting judgment to Defendants on Ms. Jackson's claim for damages for breach of contract in failing to provide home buyer's warranty insurance. Plaintiff contends the court erred in its determination that plaintiff had failed to establish the amount of damages.

The contract between OCC and Ms. Jackson provided that OCC would provide home buyer's warranty insurance to the buyer.

The evidence at trial showed that the promised coverage was not provided because the premium for the coverage was not paid out of the closing proceeds, as had been anticipated. By the time plaintiff discovered she did not have the insurance, the insurance was not available. Plaintiff claimed damage on the theory that some of the defects which OCC failed to repair would have been repaired under the insurance coverage, and also on the theory that plaintiff would have had more "peace of mind" about her purchase.

In an effort to prove damages, Ms. Jackson was asked to state her opinion of value of the home with the home buyer's insurance and her opinion of the value of the home without the insurance. She testified the difference in value was $7,000.00. She stated the figure of $7,000.00 was "pulled from her head" because that sum would compensate her for loss of peace of mind which would have come with having the insurance, and also because the lack of insurance diminished her ability to re-sell the house because the insurance protection would have been assignable to new buyers.

The trial court found there to be no substantial evidence of damages on which to base a verdict. The trial court correctly concluded that, although an owner of property is permitted to express an opinion as to the value of the property, the plaintiff in this case was not testifying as to her opinion of the value of real estate. Instead, she was testifying as to her opinion of the value of her peace of mind. Although she included a reference to the value of being able to assign the home buyer's warranty, there was not differentiation in her testimony as what was "peace of mind" and what was "assignability." Even assuming her opinion on the value of "assignability" would be admissible, which is unlikely, here it could not be admitted since there was no showing that she ever intended to, or attempted to, market the house during the effective period of the warranty.[2] Conse-

---

**2.** As to most defects, the effective period of the warranty would have been only one or two years, which had already elapsed by the time of trial. One portion of the proposed coverage (structural warranty coverage) would have provided insurance for up to 10 years, but the

quently, we agree with the trial court that plaintiff did not make a submissible case on this breach of contract claim.

 Plaintiff Jackson contends that, even if the damages were speculative, the court should have awarded nominal damages since he found that the contract was breached in that the insurance was not provided. Even if nominal damages should have been awarded, we find no prejudice to plaintiff in that the trial court did award damages to plaintiff against OCC under a different count for breach of implied warranty of fitness. The award of nominal damages on the failure-to-provide-insurance claim would have been duplicative as far as damages with the $6,000.00 awarded for the breach of implied warranty of fitness. Since there is no recovery on a claim for breach of contract for loss of "peace of mind," the only items which could have been recognized by the nominal damage award would have been the allegedly "covered" repairs, which were not proven and which, in any event, would overlap with the other damage award. We find no error in the rulings of the trial court.

### Breach of Fiduciary Duty

In plaintiff's third point, she argues the court erred in dismissing her claim for "breach of fiduciary duty" to insure that the contractual obligation to provide home buyer's insurance was fulfilled. Ms. Jackson recites no persuasive authority for the proposition that a home builder has a fiduciary duty to the party with whom it has contracted. In any event, the omission which breached the alleged duty, the failure to see that the premium for the home buyer's warranty was paid, is the same omission which was the basis of plaintiff's claim for breach of contract, as to which plaintiff failed to prove damages. Since the trial court correctly found that the damages were not established with regard to that claim, it cannot be error for the trial court to have found for defendants on

definition of "structural defect" includes only conditions whereby the home becomes unsafe, unsanitary, or otherwise unlivable. There was

plaintiff's claim for breach of fiduciary duty.

The judgment is affirmed.

All concur.

no evidence that any defects were of such a character.