45 F.Supp.2d 701 (1999)
UNION PACIFIC RAILROAD COMPANY, Plaintiff,
v.
MIDLAND EQUITIES INCORPORATED, St. Louis Marketplace Limited Partnership,
and
Thomas A. Villa, et al., Individually, and in their Official Capacities as Members of the Board of Aldermen of the City of St. Louis, Missouri,
and
Vincent C. Schoemehl, Jr. Individually, and in his Official Capacity as Mayor of the City of St. Louis, Missouri,
and
Virvus Jones, Individually, and in his Official Capacity as Comptroller of the City of St. Louis, Defendants.
No. 4:96 CV 14 DDN.
United States District Court, E.D. Missouri, Eastern Division.
March 31, 1999.
*702 Robert L. Jackstadt, Jeffrey J. Kalinowski, Partner, B. Michelle Ward, Blackwell and Sanders, St. Louis, MO, for Missouri Pacific Railroad Company aka Missouri Pacific Railroad Company, plaintiff.
David T. Butsch, Associate, Martin M. Green, Partner, Joe D. Jacobson, Green and Schaaf, St. Louis, MO, for St. Louis Marketplace Limited Partnership, defendant.
Steven R. Wild, Thompson Coburn, St. Louis, MO, Patricia A. Hageman, St. Louis City Counselor Office, St. Louis, MO, for Thomas A. Villa, Michael Sheehan, Jack Garvey, Claude Taylor, Geraldine Osborn, Irene J. Smith, Nancy S. Weber, Freeman Bosley, Sr., Bertha Mitchell, Mary Ross, Marit Clark, Phyllis Young, Stephen J. Conway, Martie J. Aboussie, Craig Schmid, Daniel Gruen, Fred Heitert, Alfred Wessels, Jr., Stephen Gregali, Marge Vining, James Shrewsberry, Joseph D. Roddy, Terry Kennedy, Velma Bailey, Sharon Tyus, Bennice Jones King, Kenneth Jones, Jim Sonderman, Robert Ruggeri, Paul Beckerle, Irving C. Clay, Gregory Carter, Daniel Mcguire, Virvus Jones, defendants.
Steven R. Wild, Elkin L. Kistner, Schlueter and Haywood, St. Louis, MO, Patricia A. Hageman, Green and Schaaf, St. Louis, MO, for Vincent C. Schoemehl, Jr., defendant.

MEMORANDUM
NOCE, United States Magistrate Judge.
This action is before the Court, for the rendering of findings of fact and conclusions of law by the Court following a non-jury hearing on plaintiff's motion for a bill in equity for the satisfaction of a consent judgment against defendant Midland Equities Incorporated. The parties have consented to the exercise of plenary jurisdiction over the action by a United States Magistrate Judge under 28 U.S.C. § 636(c).
After commencing this action, plaintiff Missouri Pacific Railroad Company (Missouri Pacific) merged into Union Pacific Railroad Company (Union Pacific) which became the real party plaintiff in interest. Union Pacific has prosecuted this action against Midland Equities Incorporated (Midland Equities), St. Louis Marketplace Limited Partnership (SLMLP), and several individuals in their individual and official capacities as mayor, comptroller, and aldermen of the City of St. Louis.
On August 27, 1997, a Consent Judgment was obtained by plaintiff Union Pacific against defendant Midland Equities Incorporated in the amount of $2,601,782.73. On March 29, 1999, the Court filed *703 its memorandum opinion and entered judgment in favor of Union Pacific against defendant St. Louis Marketplace Limited Partnership in the amount of $1,778,756.13. Currently before the Court is the motion of plaintiff to pierce the corporate veil of Midland Equities Incorporated to reach the assets of Midland Development Group, Inc.
From the evidentiary record before it, the Court makes the following findings of fact and conclusions of law:[1]

FACTS

The organization and operation of the Midland corporations.
1. Midland Development Group, Inc., (Midland Development) is a real estate development company that uses a variety of activities, including leasing, management and development. Defendant Midland Equities, Inc., (Midland Equities), which was incorporated in 1982, is part of the development arm of Midland Development. Midland Equities was responsible for contracting the purchase of development property and performing pre-development activities. Midland Equities operated without a purpose of being economically profit-making. No budget was ever prepared for Midland Equities.
2. Midland Equities had no operations independent of Midland Development. Midland Equities never maintained any insurance, general commercial liability insurance or worker's compensation insurance. The business reason for the existence of Midland Equities, Inc., was for it to be the entity into which contracts for real estate would be placed while the development was being formed. When the development occurred, the real estate would be transferred to the ultimate owner.
3. During the period from 1982 through 1994, Midland Development and Midland Equities had some common directors and officers. In 1991, they had the same directors and officers. While neither Midland Development nor Midland Equities was a shareholder of the other, they had common shareholders until 1991. After 1991, the shareholders and the directors of the two corporations differed.
4. Midland Equities never had employees. During the St. Louis Marketplace project development, without any contract, Midland Development provided the employees and services necessary to operate Midland Equities. Midland Equities and Midland Development used the same outside accounting firm. Midland Development never charged Midland Equities a fee for these services.
5. There were several years during its corporate existence in which Midland Equities failed to conduct annual meetings of the shareholders and board of directors. There are neither minutes of the director and shareholders meetings nor written consents in lieu of these meetings contained in the Midland Equities Corporate Book for 1984, 1986 through 1990, and 1992.
6. Midland Equities and Midland Development shared the same office and used the same letterhead during the development of the St. Louis Marketplace project. All of the office furniture and computers used for its purposes was owned by Midland Development. Midland Development and Midland Equities shared the same mailing address for several years. Their joint letterhead named both Midland Development and Midland Equities as corporations.
7. Midland Equities filed its own state and federal tax returns. It filed annual registration reports with the Missouri Secretary of State's office. Equities maintained its own corporate record books.

The economic relationship of the Midland corporations.
8. Since 1987 there was never any construction project in which Midland Equities *704 was involved without the presence of Midland Development.
9. Midland Equities had no source of income other than Midland Development. Midland Development paid the monthly bank account service charges in order for Midland Equities to keep its checking account open. Midland Development financed Midland Equities so that it could perform the pre-development activities for Midland Development. The Midland companies used this financing approach on the St. Louis Marketplace Project. As Midland Equities incurred costs or needed to make investments, Midland Development would extend the necessary funds to Midland Equities.
10. As of January 1990, Midland Equities' balance sheet showed a negative asset balance and it had a negative net worth of $9,670.62. As of December 1990, Midland Equities had a negative retained earnings figure. The year-to-date earnings for Midland Equities as of December 1990 was a negative $136.00. Midland Equities budgeted no income for 1990. The liabilities of Midland Equities exceeded its assets which resulted in a negative stockholders' equity for 1990. At the end of 1990, Midland Equities had a negative net worth of $9,800.00.
11. Since 1991, however, Midland Equities has not engaged in any other business activities other than serving as the general partner for St. Louis Marketplace, Limited Partnership. Midland Equities had no assets except those conveyed to it by Midland Development. As of June 1, 1991, the date of the Public Improvements Agreement of the St. Louis Marketplace project, Midland Equities had a negative net worth, its liabilities exceeding its assets. It had inadequate capital, independent of its financial relationship with Midland Development, to perform its obligations on the St. Louis Marketplace project.
12. "Midland Development Co." appeared at the top of all the internal financial statements for Midland Equities. The Midland Equities balance sheets and other financial statements were run on Midland Development's computer. The Midland Equities financial statements were internally prepared by the Midland Development accounting department.
13. All intercompany transactions were recorded and accounted for in the internal books and records. In the development of the St. Louis Marketplace shopping center, Midland Development advanced funds to Midland Equities for the purpose of making earnest deposits and funding due diligence on real estate contracts. Those funds were repaid upon the closing of the construction loan and TIF bonds. The transfers were recorded in Development's books, in the check register, and on the "intercompany schedule."
14. Midland Equities did not transfer money to Midland Development other than for repayment of advances.

The St. Louis Marketplace development.
15. St. Louis Marketplace Limited Partnership (SLMLP) developed the St. Louis Marketplace shopping center project with the City of St. Louis.
16. The site to be developed consisted largely of an abandoned steel processing plant. Two of the principal difficulties with the site were environmental problems and an existing railway line. Also, changes were to be made to Manchester Avenue to accommodate the shopping center.
17. There were two distinct construction projects involved in developing the shopping center, one private and the other public. The private part of the development consisted of a private, 483,000 square feet shopping center having an initial cost of $38 million. The private portion was financed through a construction loan of $38 million from the IBEW Pension Fund and a $30 million permanent loan from the Union Labor Life Insurance Company. There was $8 million in equity on the private side.
*705 18. The public part of the project included the widening of Manchester Avenue, the purchase of a new right-of way for the rail bed, relocating the railroad line, and other improvements incidental to the relocation. The public part was to be largely financed through the sale of tax increment financing (TIF) bonds approved and issued by the City of St. Louis.
19. Because of the risk associated with the project, the amount that was to be generated from the bond sale was reduced from $17 million to $15 million. In order to close this shortfall, St. Louis Marketplace Limited Partnership agreed with the IBEW Pension Fund to reduce its ownership interest in the shopping center from 50% to 10% in exchange for $1.8 million dollars. Those funds were infused directly into the public side of the development.
20. A number of commercial and residential properties were purchased by Midland Equities with the proceeds of the bond sale. Midland Equities had originally acquired options to purchase real estate for the project which were funded by advances from Midland Development. Those funds were later repaid to Midland Development. Midland Development never used the property acquired by Equities, other than as was specified in the bond offering Official Statement. The property acquired on the public side was exchanged with Missouri Pacific in exchange for the old right-of-way in May 1992.
21. After construction began on the public project, overruns occurred, costs that were not anticipated.
22. Midland Equities became the corporate general partner of SLMLP, because of existing environmental problems and other considerations. The major source of loaned funds, the IBEW Pension Fund, required that the limited partnership form of ownership be used for the private shopping center.
23. The partners of SLMLP were shareholders, officers, and directors of both Midland Development and Midland Equities. In exchange for its one percent ownership interest in St. Louis Marketplace, Midland Equities paid $1.00 as a participating contribution.
24. Steven Notestine, a director and an officer of both Midland Equities and Midland Development, handled all contract negotiations for the St. Louis Marketplace project. One of the contracts that Notestine negotiated was the Redevelopment Contract among Midland Equities, St. Louis Marketplace Limited Partnership, and the City of St. Louis. Notestine also negotiated the Public Improvements Agreement among the City of St. Louis, Midland Equities, and Missouri Pacific.
25. In its loan commitment letter dated April 23, 1991, Midland Development secured the following payments: $446,055 for an "acquisition fee for the land," $697,500 as a "developer's fee," a monthly "management fee" equal to three percent (3%) of gross revenue collections from the project, and "leasing fees" for signed leases. However, Midland Equities acquired the parcels of real estate for the project, was designated the "Developer" in the Public Improvements Agreement, and St. Louis Marketplace was denoted the "Developer" in the Official Statement. The Loan Commitment Letter stated: "The General Partner or an affiliate of the General Partner will be entitled to a monthly property management fee" and "the leasing fees for signed leases." Nevertheless, Midland Equities, the general partner, received no fees or money as a result of the Redevelopment Contract or the Public Improvements Agreement.
26. On the St. Louis Marketplace project, when a transfer of funds was required to be made from Midland Development to Midland Equities for "pre-development costs", Midland Equities informally requested the money and Midland Development issued a check. The only significant predevelopment costs were earnest money payments used to secure property to be acquired for the project. Midland Development advanced all of the earnest money *706 for the project which totaled approximately $300,000.
27. During the project development, the TIF bond sales proceeds were placed in the St. Louis Marketplace account for payments to third parties. In 1992, the source of money for Midland Equities' checking account was payments from Midland Development to Midland Equities for things that had to be done quicker than the usual draw process would have allowed. Those amounts were reimbursed out of the draws directly to Midland Development. There was no draw account that Midland Equities could use for payments to third parties.
28. Eventually, Midland Equities' real estate parcels were transferred to the St. Louis Marketplace Partnership. There were no written promissory notes or contracts documenting the funds loaned by Midland Development to Midland Equities. Midland Development never charged interest on these loans. Midland Equities never repaid Midland Development for the funds advanced to it.
29. Although the expected value of the completed shopping center was estimated to be $40 million of which Midland Equities had an asset, represented by one percent of SLMLP, which owed ten percent of Manchester-Ecoff Limited Partnership, which ultimately owned the St. Louis Marketplace upon its completion.
30. After the execution of the Public Improvements Agreement, Midland Equities operated without sufficient funds to meet its obligations to Missouri Pacific under that agreement. The public improvements were funded by the TIF bond proceeds and $1.8 million contributed by St. Louis Marketplace from a construction loan. When the City issued the TIF bonds, however, only $15 million was issued instead of the $17 million. Despite having $2 million less in funding, Midland Equities proceeded with the project and closing under the Public Improvements Agreement, knowing there was $2 million less than the estimated development costs.
31. The work of Missouri Pacific in the relocation of its tracks was critical to the development of the shopping center project.
32. Midland Equities did not have the ability to secure additional funds to pay the Missouri Pacific in the event TIF funds were insufficient.

Missouri Pacific's knowledge of the Midland corporations.
33. Roy Farwell, an attorney employed by Missouri Pacific, first began working on the St. Louis Marketplace project in November or December 1990. He became the chief negotiator for Missouri Pacific on the project. At the time he became involved, the Public Improvements Agreement was the subject of active ongoing negotiations. There were many drafts of the agreement and he was in regular contact with law firm attorney Steven Graham, who represented Midland Equities. Farwell was also in contact with Stephen Notestine, who represented Midland Development.
34. Graham's work on the St. Louis Marketplace project began in June 1990 and included drafting written agreements, working on the acquisition of property, and day-to-day due diligence. He also worked on the drafting of the Official Statement that was issued in connection with the TIF bonds. The Official Statement stated: "the net worth of Midland [Equities] has been represented to be essentially zero." It further states:
Midland [Equities] has primarily served as an acquisition entity and will assign its rights in and to the private projects and public project to the developer upon closing of the transaction described herein. As of December, 1990, Midland had, essentially, zero net worth. Midland is an affiliate of the Midland Development Group, Inc. (Midland Group).
35. Graham participated in drafting the Public Improvements Agreement and the Redevelopment Contract. The Redevelopment *707 Contract concerned both the public and private aspects of the development, while the Public Improvements Agreement only concerned the public works project.
36. The Public Improvements Agreement provided for the public development projects, the widening of Manchester Avenue, related infrastructure improvements, and the relocation of the railroad mainline. SLMLP was made a signatory to the Redevelopment Contract at the insistence of the City of St. Louis, even though it was not a signatory to the Redevelopment Contract.
37. Graham negotiated the Public Improvements Agreement with Farwell. Graham had many conversations with Farwell about the terms of the Public Improvements Agreement and there were at least forty-six drafts of the agreement. Graham told Farwell that Midland Equities was a corporation that was used merely as a vehicle to fashion the St. Louis Marketplace type development projects. During the documentary and other negotiations, Farwell observed that Midland Development's name was initially shown as the developer and a contracting party, and that it was replaced by the name of Midland Equities.
38. Farwell did no investigation into the financial background or credit-worthiness of Midland Equities. He did not ask for financial information and he did not run a credit check on the company, because he did not believe such precautionary measures were necessary. He believed the TIF bond funds, the primary source of financing for the project, would be sufficient and he did not believe it likely that other financing would be necessary.
39. Farwell was unaware of the construction draw process by which the TIF funds were paid out. He just believed the City of St. Louis would provide any necessary development funds.
40. Farwell received copies of the St. Louis City ordinances that were passed concerning the TIF bonds from time to time, including City ordinance 62370 which authorized the City to utilize the Official Statement in connection with the issuance of the TIF bonds.
41. No one from Midland Development told Farwell that Midland Development would pay for any expense that Midland Equities did not pay under the Public Improvements Agreement or that Midland Development would act as a guarantor of the Public Improvements Agreement. He received no documents from Midland Development or Midland Equities which caused him to believe that Midland Development stood behind Midland Equities and would pay for the railroad work.

DISCUSSION
The relief sought by the Union Pacific by its creditor's bill in equity in this action is extraordinary. As a general rule, courts recognize and protect the separate legal identity of a corporation. Jackson v. O'Dell, 851 S.W.2d 535, 537 (Mo.Ct.App. 1993). Only under very limited circumstances will courts ignore the corporate formalities and "pierce the corporate veil" to hold the shareholders or a related entity liable for the debts of a corporation. The Court agrees with Midland Development that such special circumstances do not exist here.
Missouri courts follow a three-part test for determining whether the "veil" of a corporation may be pierced. As stated by the Missouri Court of Appeals in Collet v. American National Stores, Inc., 708 S.W.2d 273, 284 (Mo.Ct.App.1986), the three elements of the test are:
(1) control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

*708 (2) such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention to plaintiff's legal rights; and
(3) the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.
Id. For the Court to pierce the corporate veil, each of the three elements must be satisfied.
On the issue of control, Collet sets out an eleven factor test:
(1) The parent corporation owns all or most of the capital stock of the subsidiary.
(2) The parent and subsidiary corporation have common directors or officers.
(3) The parent corporation finances the subsidiary.
(4) The parent corporation subscribes to all of the capital stock of the subsidiary or otherwise causes its incorporation.
(5) The subsidiary has grossly inadequate capital.
(6) The parent corporation pays the salaries and other expenses or losses of the subsidiary.
(7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.
(8) In the papers of the parent corporation or in the statements of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own.
(9) The parent corporation uses the property of the subsidiary as its own.
(10) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest.
(11) The formal legal requirements of the subsidiary are not observed.
Id.
When the Collet eleven-point test for determining control is applied to the facts of the present case, there is little question that Midland Development did not directly control Midland Equities. Of the eleven factors identified by the court in Collet, the Court is satisfied that factors (2), (3), (5), (6), (7), (9), and (10) exist sufficiently to establish that the business activities of Midland Equities were controlled by those who operated Midland Development to accomplish the goals of the St. Louis Marketplace development.
The Court believes that Midland Equities was insufficiently capitalized, even with access to the originally anticipated TIF bond sales proceeds, to reasonably satisfy its capital needs in performing its contractual obligations, because the failure of funds in this case should have been reasonably foreseen as a possibility.
To pierce the corporate veil, however, there must not only be control, but also use of that control to perpetrate a fraud or for some other improper purpose. Collet, 708 S.W.2d at 284. In a case, such as this, where the piercing claim arises from a breach of a contract, the showing of improper conduct must be particularly strong. J-R Grain Co. v. FAC, Inc., 627 F.2d 129, 135 (8th Cir.1980).
The Court in the case at bar does not find that the developers of the St. Louis Marketplace shopping center project, who operated either Midland Equities or Midland Development, did so with the intent of either defrauding anyone or otherwise committed improper conduct sufficient to cause the Court to pierce the corporate veil of either Midland Equities or Midland *709 Development to reach otherwise inaccessible assets.
In the case at bar, representatives of Missouri Pacific, early on in the contract negotiations, knew facts sufficient to put them on notice of the narrow margin between sufficient and insufficient capital to pay Missouri Pacific fully for its labor and materials. The plaintiff in J-R Grain, as here, failed to examine the finances of the company it was contracting with or otherwise act to protect itself. "[T]he contract was executed ... without any verification of Feaster Foods Agricultural Co.'s financial condition." Id. at 132.
In J-R Grain Co., the Court held that because the consensual nature of contractual relations permitted parties to negotiate measures to assure payment, courts should permit parties to allocate the risk of loss among themselves, and not interfere in this process. See, e.g., Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 43 F.3d 1054, 1064 (6th Cir.1995); Cascade Energy and Metals Corporation v. Banks, 896 F.2d 1557, 1577-78 (10th Cir.1990); United States v. Jon-T Chemicals, Inc., 768 F.2d 686, 693 (5th Cir.1985). The same principle applies here. Missouri Pacific entered into a consensual contractual relationship with an unfamiliar party, Midland Equities, without making a sufficient investigation into Midland Equities' ability to pay.
Midland Development argues that the developers and Missouri Pacific actually negotiated that Midland Development would not be a responsible party under the Public Improvements Agreement and subsequently agreed upon a change of the identity of that party to Midland Equities. The Court does not accept, on the face of the record of this case, that Missouri Pacific accepted or even envisioned a strategic benefit in allowing Midland Equities to be substituted for Midland Development in the Public Improvements Agreement.
Nevertheless, there was sufficient information available to Missouri Pacific to put it on notice of the tenuous nature of the availability of monies for paying it. The record is insufficient to persuade the Court that there was intentional fraud or misrepresentation on the part of the developers who controlled the substitution of Midland Equities in the Public Improvements Agreement. The purpose of the substitution, of course, was the protection of financially responsible persons from being economically responsible for the Missouri Pacific track relocation expenses, in the event that the then-apparently sufficient financing proved to be insufficient, a very reasonable possibility. Missouri Pacific knew the facts that indicated its economic exposure and failed to sufficiently protect itself.
As set forth above, neither Midland Equities, Midland Development, nor any other entity or person involved in the St. Louis Marketplace development concealed the financial condition of Midland Equities.
For these reasons, the motion of Union Pacific for a creditor's bill in equity is denied.
NOTES
[1] The Court incorporates by reference the findings of fact contained in the memorandum opinion filed on March 29, 1999, in this action, following the non-jury trial.